**PESAPLASTIC, C.A., Plaintiff-Appellee,**

v.

**CINCINNATI MILACRON CO.,
Defendant-Appellee,**

**Tedruth Plastics Corp.,
Defendant-Appellant.**

Nos. 82–6085, 83–5418.

United States Court of Appeals,
Eleventh Circuit.

Jan. 24, 1985.

---

Fleming, O'Bryan & Fleming, Paul R. Regensdorf, Fort Lauderdale, Fla., Carton, Nary, Witt & Arvanitis, Douglas M. Calhoun, Asbury Park, N.J., Gregory P. Borgognoni, Miami, Fla., for Tedruth Plastics Corp.

Blackwell, Walker, Gray, Powers, Flick & Hoehl, James E. Tribble, John R. Hoehl, Miami, Fla., for Cincinnati Millacron Co.

Heller & Lloyd, Henry M. Lloyd, Washington, D.C., Friedman, Britton, Cohen, Kaufman, Zinkow, Benson & Schantz, Miami, Fla., for Pesaplastic, C.A.

Before FAY and VANCE, Circuit Judges, and MacMAHON *, District Judge.

* Honorable Lloyd F. MacMahon, U.S. District Judge for the Southern District of New York, sitting by designation.

FAY, Circuit Judge:

Tedruth Plastics Corporation ("Tedruth") appeals from an adverse decision in a diversity case whereby Tedruth was found liable to Pesaplastic, C.A. ("Pesaplastic") for misrepresentation and breach of warranties in connection with the sale of a mold used to manufacture plastic pallets. Tedruth and co-defendant Cincinnati Milacron Company ("Milacron") were held jointly and severally liable for compensatory damages, and punitive damages were also assessed against Tedruth. Tedruth raises numerous issues on appeal, including jurisdiction, venue, the trial court's failure to admit an unexecuted contract into evidence, jury instructions, the jury verdict form, proof of damages, and the court's award of a judgment of contribution in favor of Milacron. We conclude that the jury's verdict was adequately supported by the evidence presented, and finding no reversible error on the part of the trial court, we therefore affirm.

FACTS

Pesaplastic is a Venezuelan corporation which was formed in 1976 with a venturous eye toward the manufacture and distribution of large plastic products in South America. Milacron is an Ohio corporation engaged in the manufacture and sale of large injection molding machines. Milacron's principal place of business is in Cincinnati, but it also maintains a Latin American Sales and Service Office in North Miami Beach, Florida.

In 1976, negotiations began between Pesaplastic and Milacron's regional sales manager in Miami, Carlos Helfenstein, concerning Pesaplastic's desire to purchase the machinery and molds required for the manufacture of plastic pallets. Helfenstein informed Pesaplastic that Milacron manufactured an injection molding machine suitable for Pesaplastic's needs. In addition, Helfenstein located a New Jersey corporation, Tedruth, which had available the type mold used in the Milacron machine for the manufacture of plastic pallets. The mold in question, a "metric mold," was built by the Japan Tool & Die Company in 1974, and had been used by Tedruth in its own manufacturing operations. Helfenstein, however, informed Pesaplastic by telex that the Tedruth mold was "brand new." [1]

On June 1, 1977, in Cincinnati, Pesaplastic and Milacron executed a written contract whereby Pesaplastic agreed to purchase from Milacron a 3,000 ton plastic injection molding machine. Immediately thereafter, Helfenstein and the representatives of Pesaplastic flew to New Jersey to meet with representatives of Tedruth. The arrangements for this meeting had been made exclusively by Helfenstein. During the course of these negotiations, Tedruth submitted for Pesaplastic's consideration a list of price quotations and a proposed contract for the sale of the mold. The representatives of Pesaplastic thereafter left New Jersey and returned to Venezuela to consider Tedruth's offer.

In August, 1977, Pesaplastic decided to purchase the metric mold and a letter of credit was drawn in favor of Tedruth for $378,000; an amount equal to that specified in the proposed contract. Tedruth subsequently shipped the mold to Milacron's Ohio plant where it was to be debugged for use in the Milacron injection molding machine. According to expert testimony elicited at trial, the debugging process is an important procedure in the mold design and production industry. (T. at 1364). The purpose is to discover beforehand any problems which might exist and to correct them. *Id.* For reasons which are unclear, this debugging process never took place. Milacron claims that Pesaplastic cancelled the test. Pesaplastic, on the other hand, claims that it was Milacron who made the cancellation when a technician from Ted-

---

1. Helfenstein's telex to Tedruth, dated February 15, 1977, stated in part:

 THERE IS A BRAND NEW MOLD AVAILABLE FOR METRIC PALLETS (120 × 100 MM) FEATURING EXCELLANT DESIGN. SUPPLIER IS ASKING USS [sic] 300 THOU-SAND FOB NEW YORK WITH ALL KNOW HOW ON PRODUCT DEVELOPMENT AND PERFORMANCE....
 I SEE UNIQUE ADVANTAGES IN SERIOUS-LY CONSIDERING THIS MOLD....
 (R.Vol. 1 at 108).

ruth failed to show up to assist in the process. In any event, the critical debugging process was never undertaken and the equipment was shipped untested to Venezuela.

Delivery of the equipment to Pesaplastic was supposed to have been made by March 8, 1978. Actual delivery, however, was not made until the fall of that year. After the equipment arrived in Venezuela, technicians from both Milacron and Tedruth traveled to South America to assemble the machinery and supervise start-up. When the technicians arrived, they found that Pesaplastic's production plant was far from being completed. The walls and roof were not yet in place and there was no electricity or water. In addition, the injection molding machine and the metric mold were found sitting in the open and exposed to the elements. Despite these conditions, the technicians performed as much of the set-up as was possible. Electricity was eventually available, but the technicians decided not to risk damaging the equipment by starting it up without the water necessary to keep the equipment cooled.

After the American technicians left Venezuela, Pesaplastic decided to start the machinery anyway and it proceeded to manufacture approximately 1,200 plastic pallets. During this initial production period, a number of the component parts of the mold, including temperature controllers and injection nozzles, ceased to properly function. In addition, molten plastic was inadvertently injected into the electrical cavity of the mold, after which production was halted altogether. Although water eventually became available, Pesaplastic was unable to sustain production for any significant period of time. Various problems sporadically arose with both the mold and the injection molding machine.

During 1979, Pesaplastic twice requested additional technical assistance from Tedruth. Tedruth responded to the first telex

by arranging for a former employee to send supplemental operating information to Pesaplastic. As to the second telex, Tedruth replied by asking Pesaplastic to call first to see if the problem was one that could be resolved over the phone. In the meantime, however, Pesaplastic managed to get production started again and the requested phone call was never made.

Despite resumed production, and as a result of having suffered financial losses due to down time and repairs, Pesaplastic filed a diversity suit in the United States against both Milacron and Tedruth. After this suit was filed, Pesaplastic continued to experience breakdowns of both the Milacron machine and the Tedruth mold. Pesaplastic repeatedly tried on its own to repair the highly technical equipment but was unsuccessful. Finally, while their law suit was pending in the federal court, Pesaplastic was forced to go out of business.

COURSE OF PROCEEDINGS

Pesaplastic's diversity suit against Milacron and Tedruth was filed October 4, 1979, in the United States District Court for the Southern District of Florida. The complaint essentially alleges fraud, breach of contract and warranties, negligence, and breach of fiduciary responsibility. In response to Pesaplastic's complaint, defendant Tedruth filed motions to dismiss on the basis of lack of personal jurisdiction, improper venue, and insufficiency of service of process. These motions were denied and answers were filed by Tedruth and Milacron in February of 1980.[2] Among other things, both defendants asserted contributory negligence as a defense.

Jury trial commenced on May 24, 1982. At the conclusion of the three-week trial, the jury rendered a verdict in favor of Pesaplastic and against both Milacron and Tedruth. The percentage of negligence attributed to each party by the jury was: Pesaplastic—41%; Milacron—16%; Ted-

---

**2.** Milacron's answer also included a counterclaim against Pesaplastic alleging default by Pesaplastic on a $149,000 promissory note given as part of the consideration for the injection molding machine. At the close of all the evidence, the district court directed a verdict in favor of Milacron for $215,817.31, an amount representing the principal owed plus interest accrued. As part of Milacron and Tedruth's post-verdict settlement, however, Pesaplastic paid Milacron $10.00 as a complete satisfaction of Milacron's counterclaim.

ruth—43%. Pesaplastic was awarded compensatory damages against both defendant corporations jointly and severally in the amount of $1,500,000. Punitive damages were also assessed against Tedruth in the sum of $1,250,000.

A notice of appeal was subsequently filed by both Milacron and Tedruth. Shortly thereafter, Pesaplastic and Milacron entered into a settlement agreement whereby Milacron paid Pesaplastic $1,215,817.31 as a complete satisfaction of the compensatory damages portion of Pesaplastic's judgment. Milacron then filed a motion for a judgment of contribution against Tedruth. That motion was granted and resulted in a final judgment being entered in favor of Milacron and against Tedruth for the sum of $889,370.36. A notice of appeal from the judgment of contribution was also filed by Tedruth.

## JURISDICTION

Of primary importance in the disposition of this case is the issue of jurisdiction. The district court found that it did have jurisdiction over Tedruth under Florida law. The basis of this decision was the jury's finding that Milacron was an agent of Tedruth. Tedruth, however, denies the existence of any agency relationship between itself and Milacron and argues that the complaint against it should have been dismissed for lack of jurisdiction.

This court generally evaluates a jurisdictional problem by looking first at the applicable state statute and then at federal due process requirements. In diversity cases such as this one, "the federal court is bound by state law concerning the amenability of a person or a corporation to suit, so long as state law does not exceed the limitations imposed by the Due Process Clause of the Fourteenth Amendment." *Washington v. Norton Manufacturing, Inc.*, 588 F.2d 441, 444 (5th Cir.), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979);[3] *see Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank*, 701 F.2d 889, 890 (11th Cir.1983); *Rubaii v. Lakewood Pipe of Texas, Inc.*, 695 F.2d 541, 543 (11th Cir.1983).

Jurisdiction over Tedruth must therefore be determined by looking first at the law of the state of Florida. The applicable Florida statute, Fla.Stat.Ann. § 48.193 (West Supp. 1984), provides that any person, whether or not a citizen or resident of Florida, who personally or *through an agent* operates, conducts, engages in, or carries on a business or business venture in Florida, or who maintains an office or agency in that state, thereby submits himself to the jurisdiction of the Florida courts.[4]

There is no evidence that Tedruth directly conducted business in Florida or ever sought authority to transact business in

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981. We are likewise bound by Unit B decisions of the former Fifth Circuit handed down after October 1, 1981. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

**4.** The pertinent portions of § 48.193 are as follows:

 **48.193.** Acts subjecting persons to jurisdiction of courts of state

 (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits that person and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following:

 (a) Operates, conducts, engages in, or carries on a business or business venture in this state or has an office or agency in this state.

 (b) Commits a tortious act within this state.

 (c) Owns, uses, or possesses any real property within this state.

 * * * * * *

 (f) Causes injury to persons or property within this state arising out of an act or omission outside of this state by the defendant, provided that at the time of the injury either:

 1. The defendant was engaged in solicitation or service activities within this state which resulted in such injury; or

 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use, and the use or consumption resulted in the injury.

 (g) Breaches a contract in this state by failing to perform acts required by the contract to be performed in this state.

that state as a foreign corporation.[5] We therefore agree with the district court that a finding of jurisdiction as to Tedruth under the Florida statute is largely dependent on the narrow factual issue of agency. Milacron is clearly authorized to transact business in Florida and has a registered office and registered agent in Miami. If Milacron acted as Tedruth's agent in its dealings with Pesaplastic, then clearly Tedruth is subject to Florida jurisdiction as a "person" conducting business in Florida through an agent.

■ "Under Florida case law, a question of agency is reserved to the trier of fact when resolution of the issue depends on the inferences to be drawn from the facts adduced." *Borg-Warner Leasing v. Doyle Electric Co.*, 733 F.2d 833, 836 (11th Cir. 1984) (citing *Amerven, Inc. v. Abbadie*, 238 So.2d 321, 322 (Fla.Dist.Ct.App.1970)). In the instant case, the jury specifically found that Milacron acted as Tedruth's agent with respect to the transaction with Pesaplastic.[6] There is ample evidence in the record to support this conclusion. When a trier of fact specifically finds that an agency relationship exists between two corporations, and the agent corporation is authorized and does conduct business in Florida for the benefit of the principal corporation, we are of the opinion that the Florida jurisdictional statute clearly brings the principal corporation, in this case Tedruth, within the jurisdiction of the Florida courts.

■ Having upheld the district court's finding of jurisdiction under the Florida statute, we next turn to the constitutional considerations regarding jurisdiction. The due process clause of the Fourteenth Amendment requires that Tedruth have such minimum contacts with Florida so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *Rubaii*, 695 F.2d at 544.

Applying the mode of analysis developed in *International Shoe*, we must first define the extent of Tedruth's activities in Florida. As previously stated, Tedruth has never officially sought authority to transact business in Florida nor does it have any offices or agents in that state. Clearly Tedruth does not engage in continuous and systematic activities in Florida. Where such is the case, "jurisdiction depends on the relationship between the cause of action on the one hand and the nature and quality of defendant's activities on the other hand." *Rubaii*, 695 F.2d at 544 (citing, among other cases, *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)). Moreover, the burden is on Pesaplastic to make a prima facie showing of the facts on which jurisdiction is predicated. *Rubaii*, 695 F.2d at 544.

In the instant case, we find from the record that Pesaplastic has shown numerous Miami-based activities which led directly to the sale of the Tedruth mold. The link between Tedruth and these activities is, of course, Helfenstein, Milacron's Miami-based sales representative. The record is uncontroverted that Helfenstein advised Pesaplastic of the availability of the Tedruth mold, furnished price quotations, made several sales pitches concerning the mold, and in fact traveled to Venezuela for the purpose of discussing, among other things, the metric mold. The record also indicates that Pedro Hoffman, President and Director of Pesaplastic, and Mario Fernandez, former Managing Director of Pesa-

---

5. Under Fla.Stat.Ann. § 607.304(1) (1977), "[n]o foreign corporation shall have the right to transact business in this state until it shall have filed an application for authority to do so with the Department of State...."

6. With regard to the question of agency, the pertinent question and answer contained in the jury verdict form are as follows:

3. Was the defendant-Cincinnati Milacron Company ever the agent of the defendant-Tedruth Plastics Corporation in connection with any aspect of this entire transaction?

Yes X No 

(R. Exhibit at 141).

plastic, met with Helfenstein in Miami to further discuss this matter.

Throughout the course of these negotiations, numerous telexes concerning the mold were sent from Helfenstein's Miami office to both Pesaplastic and Tedruth. The contents of these telexes leaves little doubt that Tedruth and Milacron were acting in concert to persuade Pesaplastic to buy the Tedruth mold. When Pesaplastic wanted samples of the pallets, it was Helfenstein who worked out the air freight and customs clearance arrangements. All of the contacts with Pesaplastic made prior to Pesaplastic's representative's trip to the Tedruth plant were made by Helfenstein from his Miami office. In addition, the details for that visit were also made by Helfenstein in Miami, and he accompanied Pesaplastic's representatives to New Jersey. Tedruth was well aware of Helfenstein's efforts and at some point agreed to pay him $3,000 as a commission on the sale of the mold.

These activities are clearly an integral part of Pesaplastic's cause of action and as such, they constitute the sufficient minimum contacts necessary to support jurisdiction. Accordingly, we find no error in the district court's refusal to dismiss the complaint on these grounds.

VENUE

■ In a diversity case, a federal court determines venue in accordance with federal law. The applicable statute, 28 U.S.C. § 1391(c) (1976), provides that "[a] corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business." Tedruth argues that because it is not incorporated or licensed to do business in Florida, venue in this case can only be predicated on the "doing business" language of the aforementioned statute. Tedruth then cites a number of cases, none of which are binding on this court, which hold that "doing business" to a degree sufficient for jurisdictional purposes is not necessarily "doing business" to a degree sufficient for venue. This argument ignores altogether the fact that Milacron, Tedruth's agent, was licensed to do business in Florida and did

conduct business there on Tedruth's behalf. In view of this agency relationship, we hold that Tedruth was in effect authorized to do business in Florida and was doing business there within the meaning of § 1391(c).

We also find that this holding does not conflict with the general principle that venue in the federal courts is primarily a matter of convenience of the litigants and witnesses. *Denver & R.G.W.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 560, 87 S.Ct. 1746, 1748, 18 L.Ed.2d 954 (1967). "In any case, the court should not oppose the plaintiff's choice of venue if the activities that transpired in the district where suit is brought were not insubstantial and the forum is a convenient one balancing the equities and fairness to *each party*." *Florida Nursing Home Association v. Page*, 616 F.2d 1355, 1361 (5th Cir.) (emphasis added), *cert. denied*, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980), *rev'd on other grounds*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981), *on remand*, 648 F.2d 241 (5th Cir.1981). The plaintiff in this case is a South American corporation. The numerous Miami-based activities already set forth were vital to the sale of the Tedruth mold. Faced with such a set of facts, we see no sound reason why the plaintiff's choice of forum should be disturbed.

THE COURT'S REFUSAL TO ADMIT PROPOSED CONTRACT

During the course of the negotiations, Tedruth submitted for Pesaplastic's consideration a letter containing price quotations, and a proposed contract for the sale of the metric mold. This proposed contract was never executed by the parties. The trial court admitted the price quotations into evidence. The proposed contract, however, was deemed irrelevant by the trial judge on the ground that it had never been executed and was therefore unenforceable. Accordingly, it was held inadmissible. Tedruth argues on appeal that the parties intended to be bound by the terms of the proposed contract and that the proposed contract was relevant as tending to show what the agreed upon terms were. We find this

argument to be without merit. If the parties intended to be bound by the terms of the proposed contract, then surely they would have signed it. Tedruth's argument would have us bestow upon a nullity the same weight and probative value generally reserved for binding and legally enforceable contracts. This we decline to do.

■ To be admissible, evidence must be relevant, and resolution of the relevancy question lies firmly within the discretion of the trial judge. *Copeland v. Gulf Oil Corp.*, 672 F.2d 867, 871 (11th Cir.1982); *Williams v. Board of Regents*, 629 F.2d 993, 999 (5th Cir.1980), *cert. denied*, 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981). Absent a clear showing of an abuse of discretion, the trial court's rulings on relevancy and materiality of evidence will not be disturbed. *Copeland*, 672 F.2d at 871; *Richardson v. McClung*, 559 F.2d 395, 396 (5th Cir.1977). The trial judge's refusal to admit the proposed contract into evidence was not, in this court's opinion, an abuse of discretion. Moreover, even if we were to find that the district court erred in not admitting the unexecuted contract, we are convinced that such error would not rise above the threshold of harmless error. *See Perry v. State Farm Fire & Casualty Co.*, 734 F.2d 1441, 1446 (11th Cir.1984). The district court clearly stood on solid ground in refusing to admit the unexecuted contract, and that decision will therefore not be disturbed on appeal.

## PROOF OF DAMAGES

At trial, the district court excluded evidence that Pesaplastic suffered lost profits as a result of problems encountered with the injection molding machine and the metric mold. The basis of this ruling was that because Pesaplastic was a new business venture, any evidence tending to show lost profits would be speculative in nature and thus improper. The trial court did, however, allow Pesaplastic to submit evidence regarding its actual total operating losses. The testimony substantiating these losses came from Pesaplastic's accountant. To further prove damages, Pesaplastic sought to introduce the testimony of an expert in the field of business logistics and transportation. It was this expert's testimony as to lost profits which was excluded. The expert was, however, permitted to discuss various other aspects of Pesaplastic's projected revenues and expenditures at various production levels which, in his opinion, could have been attained had the mold functioned as expected.

■ On appeal, Tedruth claims that Pesaplastic failed to show that its actual total operating losses would not have occurred but for the problems with the Tedruth mold. Tedruth further argues that Pesaplastic's accountant's testimony regarding operating losses was at least as speculative as that regarding lost profits and likewise should have been excluded. We disagree.

At trial, Tedruth's objection to the accountant's testimony was not that his calculations were speculative, but rather that there was no showing of what Pesaplastic's profits or losses would have been had the mold functioned as expected. (T. at 1864). The trial court overruled this objection. While we agree with appellant's contention that total operating losses, in and of themselves, would be an improper measurement of damages in this case, we find that these losses were placed into proper perspective by the subsequent testimony of the logistics and transportation expert. The testimony of these two experts, when considered together, provided an adequate and fair basis by which the jury could determine damages. The general rule that "uncertainty as to the precise amount of ... damages does not preclude recovery if there is some reasonable basis in the evidence for the amount awarded," *Clearwater Assoc. v. Hicks Laundry Equipment Corp.*, 433 So.2d 7, 8 (Fla.Dist.Ct. App.1983), therefore controls. Furthermore, Tedruth certainly could have argued against the attainability of these production levels during closing arguments.

■ Questions concerning the relevancy of evidence of damages are clearly discretionary with the trial court, and absent a clear showing of abuse, the court's determination on such matters will not be disturbed on appeal. *See Fabrica Italiana*

*Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 781 (11th Cir.1982). For the aforementioned reasons, we find no abuse of discretion on the part of the trial court with regard to the damages issue.

## JURY INSTRUCTIONS

 Tedruth assigns as error the trial court's refusal to give certain proposed jury instructions. The purpose of jury instructions "is to give the jury a clear and concise statement of the law applicable to the facts of the case." *Hanover Fire Insurance Co. v. Sides*, 320 F.2d 437, 444 (5th Cir.1963). The granting or denial of jury instructions in diversity cases is controlled by federal laws and federal rules while the substance of those instructions is governed by the applicable state law, *Kroger Co. v. Roadrunner Transportation, Inc.*, 634 F.2d 228, 230 (5th Cir. Unit B 1981), in this case the law of Florida.

 In reviewing the district court's jury instructions, this court will look to see whether the charges, considered as a whole, sufficiently instruct the jury so that the jurors understand the issues involved and are not misled. *Frosty Land Foods International, Inc. v. Refrigerated Transport Co.*, 613 F.2d 1344, 1348 (5th Cir. 1980); *see Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir.1981); *see also Somer v. Johnson*, 704 F.2d 1473, 1477–78 (11th Cir.1983) (to determine prejudicial effect, charge must be viewed in its entirety); *Johnson v. Bryant*, 671 F.2d 1276, 1280 (11th Cir.1982) ("When the instructions, taken together, properly express the law applicable to the case, there is no error...."). Moreover, the trial court's refusal to give a requested instruction is not error where the substance of that proposed instruction was covered by another instruction which was given. *See Freimanis v. Sea-Land Service, Inc.*, 654 F.2d 1155, 1163–64 (5th Cir. Unit A 1981);

*see also Southern Railway Co. v. Haynes,* 293 F.2d 291, 294 (5th Cir.1961). If a requested instruction is refused and is not adequately covered by another instruction, the court will first inquire as to whether the requested instruction is a correct statement of the law. See e.g., *Bueno v. City of Donna,* 714 F.2d 484, 490 (5th Cir.1983). If the instruction is a correct statement of the law, the court will next look to see whether it deals with an issue which is properly before the jury. See e.g., *Collins v. Metropolitan Life Insurance Co.,* 729 F.2d 1402, 1405 (11th Cir.1984). In the event both these standards are met, there still must be a showing of prejudicial harm as a result of the instruction not being given before the judgment will be disturbed. *See Hunt v. Liberty Lobby,* 720 F.2d 631, 647 (11th Cir.1983); *Somer,* 704 F.2d at 1477–78; *Miller,* 650 F.2d at 1372 (5th Cir.1981).

 On appeal, Tedruth assigns as error the trial court's refusal to give several of their requested instructions.[7] We have reviewed the requested charges individually and find that for the most part, the gist of these charges was substantially covered by the instructions which were given. Utilizing the aforementioned analysis, we conclude that the district court's instructions to the jury, when viewed in their entirety, constitute a clear, concise, and accurate statement of the law.

## JUDGMENT OF CONTRIBUTION

At the conclusion of the trial, final judgment was entered in favor of Pesaplastic awarding compensatory damages of $1,500,000, jointly and severally, against Milacron and Tedruth. Milacron paid Tedruth $1,215,817.31 for a complete satisfaction of the compensatory damage portion of Pesaplastic's judgment. Milacron thereafter filed a motion for a $889,370.36 judgment of contribution against Tedruth.

---

7. This court is shocked by certain statements made in Tedruth's brief which imply that the trial judge failed altogether to instruct the jury on particular issues, for example proximate cause and mitigation of damages (Brief for Appellant at 1), when in fact the trial judge merely gave an instruction containing different language from that requested. (T. at 3218–3220 and 3225). Such misleading statements, whether intentional or not, are not only inappropriate, but tend to cast doubt on all allegations thereafter made.

This amount was derived from "the percentage of responsibility for any negligence" which the jury attributed to each party.[8] The trial court granted Milacron's motion and Tedruth appeals that decision on the ground that it was improper for the court to base this award solely upon theories of comparative negligence.

Tedruth's argument, as we understand it, is that because the percentage of negligence attributed to Milacron (16%) was less than that attributed to Pesaplastic (41%), Pesaplastic was precluded from recovering compensatory damages from Milacron under the theory of comparative negligence. Tedruth further argues that the judgment entered against Milacron was based not on negligence, but rather on Milacron's misrepresentation that the mold was new. According to Tedruth's argument, the jury should also have been asked to state the percentage of fault attributable to each tortfeasor for this misrepresentation. These latter percentages, Tedruth claims, would then have been the appropriate ones to use in determining Tedruth's amount of contribution. We are not persuaded by this argument.

■ First of all, Tedruth's argument that Milacron was not liable to Pesaplastic for compensatory damages because its percentage of negligence was less than that of Pesaplastic is untenable. The theory underlying this argument is one of contributory negligence, not comparative negligence, and Florida is unquestionably a comparative negligence state. See e.g., *Hoffman v. Jones*, 280 So.2d 431 (Fla.1973).

■ Secondly, we find no support for Tedruth's assertion that Milacron's liability was based solely on its misrepresentation and not on negligence. To the contrary, the jury specifically found that Milacron's negligence in locating and failing to test the mold was a proximate cause of Pesaplastic's damages.[9] Moreover, the jury's answers to questions posed by the trial court in the verdict form suggests that the jury found the misrepresentation to be just one factor indicative of fault and not the sole basis of liability.

■ The Florida Uniform Contribution Among Tortfeasors Act, Fla.Stat.Ann. § 768.31(3)(a) (West Supp.1984), provides that in determining contribution among tortfeasors, the basis of allocation of liability shall be the "relative degrees of fault" attributed to each party. We find that the jury's stated percentages of responsibility for negligence provided a proper basis from which to determine Tedruth's amount of contribution under the Florida law.

Accordingly, the district court's order granting Milacron's motion for judgment of contribution in the requested amount is upheld.

## JURY VERDICT FORM

■ Tedruth's final argument on appeal is that the trial judge, through his questions to the jury in the verdict form, misled the jurors on the issue of punitive damages. The specific question challenged by Tedruth asks the jury to determine whether Tedruth acted in a "willful, wanton, reckless, malicious or grossly negli-

---

**8.** In determining the amount of contribution for which Tedruth was liable, the district court relied on calculations contained in Milacron's motion for judgment of contribution:

> [T]he relative fault of TEDRUTH and MILACRON for compensatory damages to the plaintiff was in the ratio of 2.6875 to 1.0, the jury having assessed TEDRUTH'S conduct as 43% responsible for plaintiff's losses and MILACRON'S conduct as 16% responsible.... The consideration paid by MILACRON for the complete satisfaction of the compensatory damages judgment ... having been in the amount of $1,215,817.31, and the relative fault of Tedruth having been in the amount of

> $889,370.36 (73.15% of the total fault of the defendants, MILACRON and TEDRUTH)....
> (R. Vol. 5 at 977).

**9.** The verdict form was returned by the jury as follows:

> 2. Did the defendant-Cincinnati Milacron Company act negligently in connection with locating the mold, or in failing to test the mold, which negligence was a proximate cause of damage to the plaintiff, Pesaplastic?
>
> Yes X No ____
>
> (R. Exhibit at 141).

gent manner." (R. Exhibit at 141). Tedruth's position is that in cases involving an alleged breach of contract, more than mere *willful* conduct is necessary in order to justify an award of punitive damages. While this may be true, we cannot overlook the fact that the jury based Tedruth's liability on more than just a breach of expressed or implied warranties. The jury specifically found that Tedruth made false representations concerning the mold and that Tedruth acted negligently in connection with the sale of the mold. (R. Exhibit at 141).

In *Walsh v. Alfidi*, 448 So.2d 1084, 1086–87 (Fla.Dist.Ct.App.1984), the court held that in an action for fraudulent misrepresentation, punitive damages may be awarded when there is evidence that the defendant acted with "malice, moral turpitude, wantonness, *willfulness* or reckless indifference to the rights of others...." (emphasis added). The court further noted that "[e]ven if a jury were to find [the defendants' misrepresentation] unintentional, an award of punitive damages would be justified if there is shown an entire want of care by defendant in the exercise of the duty it assumed toward the plaintiff." *Id.* at 1087 (quoting *Tinker v. DeMaria Porsche Audi, Inc.*, 459 So.2d 487 (Fla. Dist.Ct.App.1984)).

Accordingly, we find the question contained in the jury verdict form to be a correct inquiry under Florida law. We further note that this question is substantively identical to the punitive damages question proposed by Tedruth and that Tedruth made no objection whatsoever to this question at trial.[10] Having found ample basis for the jury's assessment of punitive damages, that award is hereby upheld.

CONCLUSION

Having reviewed the record and arguments in this case, we find no compelling reason why the judgment of the trial court should be disturbed. There is adequate support for the jury's findings of both liability and damages, and the judgment is therefore AFFIRMED.

---

10. The punitive damages question requested by Tedruth in its proposed jury verdict form reads as follows:

18. Did the actions of Tedruth constitute gross, willful or wanton misconduct? (R. Exhibit at 141).