United States Court of Appeals,

Eleventh Circuit.

No. 96-2678.

James GOULAH, husband, Nancy Goulah, wife, Plaintiffs-Appellants,

Ajodhia Dabydeen, etc., et al., Plaintiffs,

v.

FORD MOTOR COMPANY, a foreign corporation, Defendant-Appellee,

Eris, Inc., Movant.

Aug. 7, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-1591-CIV-T-24E), Susan C. Bucklew, Judge.

Before BLACK, Circuit Judge, and FAY and ALARCON[*], Senior Circuit Judges.

FAY, Senior Circuit Judge:

James and Nancy Goulah, residents of the State of Florida, filed this products liability action against Ford Motor Company, a Delaware corporation, alleging that defects in, and the negligent design of the Ford Bronco II caused the Goulahs to sustain serious injuries in a rollover accident. After a three week trial, the jury returned a verdict for Ford. Plaintiffs now appeal the trial court's admission and exclusion of various pieces of evidence and the court's refusal to give several requested jury instructions, including an instruction on comparative negligence. We affirm.

I.

On October 4, 1989, James and Nancy Goulah ("Plaintiffs") were severely injured when their Ford Bronco II 4x2 rolled over on Interstate 75 in Central Florida. At the time of the accident, Plaintiffs were towing a small trailer, which was attached to the standard "ball hitch" that came on the rear of the vehicle. Mr. Goulah was driving, while Mrs. Goulah was riding in the passenger seat.

Mrs. Goulah testified at trial that she and her husband had just begun a three week vacation. They were traveling north on I-75 at about 55 m.p.h., when Mrs. Goulah looked in her side mirror

[*]Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

and saw the trailer go "slightly left, and slightly right, and slightly left." R42-30. Thereafter, the trailer "swung around," fell over, and slid down the highway. Plaintiffs' vehicle broke away from the trailer and went into a barrel roll. *Id.* Mrs. Goulah was ejected from the vehicle, but sustained less serious injuries than her husband, who unfortunately was pinned inside. Mr. Goulah remains partially paralyzed to this day.

Plaintiffs filed suit against Ford Motor Company, alleging that Ford's (i) negligent design of the Bronco II, (ii) distribution of an unreasonably dangerous and defective product, and (iii) failure to warn owners about the Bronco II's rollover propensity caused the Plaintiffs' accident.[1] The Ford Bronco II is a "small" or "light" sport utility vehicle that was sold in the U.S. from 1983 to 1990.[2] In general terms, "sport utility vehicles" (sometimes referred to as "SUVs") are multipurpose passenger vehicles that have varying degrees of off-road capability. "Small" SUVs are smaller and lighter than "full-sized" utility vehicles, and they typically have a shorter wheel base.[3] Compared to normal passenger cars, small SUVs typically have a shorter track width[4] and higher center of gravity.[5] These factors, according to Plaintiffs, create an unreasonably dangerous risk of rollover.[6]

---

[1]Plaintiffs asserted numerous other claims in their complaint, but none are relevant to this appeal.

[2]The "Bronco II" should not be confused with the "Bronco," which is a full-sized SUV. Nor should the four-wheel drive version of the Bronco II ("Bronco II 4x4") be confused with the two-wheel drive version ("Bronco II 4x2"). We use the phrase "Bronco II" generically. Where the distinction between the 4x4 and 4x2 is important, we will so specify.

[3]"Wheel base" is the distance between a vehicle's front and rear axles.

[4]"Track width," also called "tread width," is the side-to-side distance between the left and right tires (measured from the center of the tire tread).

[5]The "center of gravity" is the point on an object at which the result of all gravitational forces is aimed.

[6]The major engineering concepts involved in this case revolve around the basic laws of physics. Although the terms seem somewhat technical, the principles are quite simple: Imagine two buildings. One is a skyscraper located on the corner of a city street. The other building is only two stories, but takes up an entire city block. If hurricane force winds blow through town, which building is more likely to fall over? The skyscraper of course. The same principles hold true for cars; narrower, taller vehicles will fall over more easily than wider, shorter vehicles. Likewise, if the forces are great enough, narrow, taller vehicles will also roll completely over more easily than wider, shorter vehicles.

That risk is allegedly greater with the Bronco II than with any other comparable vehicle on the market.

In response to Plaintiffs' complaint, Ford generally denied all allegations and also asserted the defense of comparative negligence. At trial, Ford sought to support that defense with evidence (1) that the trailer attached to the rear of Plaintiffs' Bronco did not have any trailer brakes, which were required by Florida law, (2) that the trailer was improperly loaded and caused the vehicle's instability, (3) that Mr. Goulah, who suffered a stroke three years prior to the incident, had a seizure while driving, (4) that Mr. Goulah failed to drive the vehicle properly, and (5) that Plaintiffs were not wearing their seat belts at the time of the accident. In both its opening statement and closing statements to the jury, Ford argued that it was these factors that caused Plaintiffs' accident, not the Bronco II.

Before trial, Plaintiffs filed a motion in limine to exclude reports about the Bronco II written by the National Highway Safety Traffic Administration ("NHTSA"). NHTSA began a defect investigation of the Bronco II in 1988. The alleged defects under investigation were defined as "the rollover susceptibility of the Bronco II and the crash worthiness of the vehicle during a rollover." As in all defect investigations, NHTSA sent a request for information to Ford, asking for specific information related to all Bronco IIs "sold in the U.S. since August 1, 1982." After NHTSA completed its investigation, the agency ultimately concluded that there were no safety-related defects in the Bronco II.

In opposition to the admissibility of NHTSA's reports,[7] Plaintiffs attempted to show that Ford deliberately altered, destroyed, and withheld documents from NHTSA and that therefore, NHTSA's conclusions were untrustworthy. Ultimately, the district court denied Plaintiffs' motion to exclude the evidence.

At trial, Ford employees admitted that a great deal of information was withheld from NHTSA, but they claimed it was only because the information was not relevant to NHTSA's inquiry

---

[7]Some of the other NHTSA documents do not relate specifically to the Bronco II, but relate to the rollover propensity of light utility vehicles in general.

or because it related only to "prototype" vehicles, which were different from the Bronco II's "sold after August 1, 1982." General Jerry Curry, the former Administrator of NHTSA, testified that during the NHTSA investigation of the Bronco II there was never any allegation that Ford withheld documents from NHTSA. According to Curry, if there had been such an allegation, NHTSA would have investigated it thoroughly. Curry also stated that the agency's requests for information were very specific and that if the agency had wanted "prototype" information, it would have specifically requested it in its letter. Based on this testimony, the district court ultimately concluded that Plaintiffs had failed to present evidence sufficient to substantiate their claim that Ford withheld documents from NHTSA. The court instructed the jury "to disregard all evidence and argument suggesting that Ford Motor Company failed to submit to NHTSA any requested documentation concerning the Bronco II vehicle."

Plaintiffs introduced other evidence of "document destruction," which centered on the fact that 52 documents relating to the Bronco II's stability factors were "missing" from Ford's files. Frederick Parrill, a Ford employee, testified that during the Bronco II's development stages, Ford's Office of General Counsel ("OGC") requested engineers to gather all data, documents, and files relating to the Bronco II. Parrill acknowledged that concerns about Bronco II product liability spawned the collection efforts and that Ford lawyers were involved in Bronco II meetings.

Parrill was put in charge of collecting the documents, but before doing so, he sent a letter to his engineers requesting them to "list" the documents in their possession. Approximately 110 documents ended up on the list, but only half were ever collected. From these facts, Plaintiffs urged the jury to believe that Ford had "selectively" weeded out the documents that might expose them to liability. Ford explained simply that it collected over 10,000 documents relating to the Bronco II and that some of them had been unintentionally destroyed in accordance with Ford's normal protocol for document disposal.

With respect to these document destruction allegations, Plaintiffs filed a motion for default judgment before trial. The district court denied the motion. Plaintiffs thereafter requested a jury instruction that the "bad faith destruction of relevant evidence gives rise to a strong inference that

production of the evidence would have been unfavorable to the party responsible for its destruction. If you determine that one of the parties lost or destroyed or otherwise tampered with evidence, the burden is imposed upon the party to prove that the loss or destruction was not in bad faith." The court declined to give any instruction concerning document destruction. R50-35 thru 36.

At the close of evidence, Ford withdrew its comparative negligence defense. Plaintiffs requested the court to instruct the jury on comparative negligence anyway. The court refused. Plaintiffs then argued that Ford should be prohibited from arguing to the jury that Plaintiffs' negligence caused the accident. To Plaintiffs, that meant Ford could not argue the trailer breaks, improper loading, improper driving, or seat belt issues. Ford argued that, despite having withdrawn its comparative negligence defense, it was still entitled to assert the defense of "sole legal cause," which means that it could still argue Plaintiffs were totally responsible for their injuries. The court agreed with Ford.

The court gave the jury its instructions and submitted a special jury verdict form for their consideration. The form asked the jury first to decide whether "Ford Motor Company place[d] the 1987 Bronco II on the market with a defect which was unreasonably dangerous such that the defect was a legal cause of damage to the [P]laintiffs?" The jury answered, "No." Question two asked whether there was "negligence on the part of [Ford] in the design of the 1987 Bronco II that was a legal cause of damage to the [P]laintiffs?" The jury answered, "No." Finally, question 3 asked whether there was "negligence on the part of [Ford] in failing to warn or instruct users of the 1987 Bronco II that was a legal cause of damage to the [P]laintiffs?" The jury answered, "No." Based on this verdict, the court entered judgment for Ford. This appeal ensued. Plaintiffs challenge (i) the district court's admission of the NHTSA documents, (ii) the exclusion of the proffered testimony of ex-Ford employee, Larry Bihlmeyer (discussed in more detail below), (iii) the trial court's refusal to instruct the jury on comparative negligence, (iv) the court's refusal to instruct the jury that NHTSA's standards were minimum standards, (v) the court's given instruction to disregard the evidence that Ford withheld documents from NHTSA, and (vi) the court's refusal to instruct on Ford's "bad faith" destruction of evidence. We affirm.

II.

We review the district court's rulings on the admissibility of evidence for abuse of discretion. *See Joiner v. General Elec. Co.,* 78 F.3d 524, 529 (11th Cir.1996), *cert. granted,* U.S. , --- U.S. ----, 117 S.Ct. 1243, 137 L.Ed.2d 325 (1997). We will not overturn an evidentiary ruling unless the moving party proves a substantial prejudicial effect. *See Judd v. Rodman,* 105 F.3d 1339, 1341 (11th Cir.), *reh'g denied,* 114 F.3d 1204 (11th Cir.1997).

A.

Plaintiffs first contend that the district court abused its discretion by admitting the documents written by NHTSA. According to Plaintiffs, those documents lacked sufficient indicia of trustworthiness to fall within the 803(8)(C) exception to the hearsay rule.[8] Fed.R.Evid. 803(8)(C). Plaintiffs also believe that the admission of the NHTSA documents seriously prejudiced their case. *See* Fed.R.Evid. 403. We do not reach the merits of Plaintiffs' arguments, but conclude that Plaintiffs failed to preserve these objections for appeal.

Rule 103 of the Federal Rules of Evidence states that reversible error may not be predicated upon a ruling which admits evidence unless "a timely objection or motion to strike appears of record...." *Judd v. Rodman,* 105 F.3d 1339, 1342 (11th Cir.) (quoting Fed.R.Evid. 103), *reh'g denied,* 114 F.3d 1204 (11th Cir.1997). The objecting party must state a "specific ground of objection." *Judd,* 105 F.3d at 1342 (quoting Fed.R.Evid. 103). An objection on one ground will not preserve an error for appeal on other grounds. *Id.*

Plaintiffs challenge the admission of 7 different NHTSA documents. *See* Appellant's Br. at 7-8. As to four of those documents, Plaintiffs' counsel specifically stated at trial that he had "no objection" to their admission. *See* R45-43 (defense exhibit 267); R45-43 (exhibit 269); R45-104 (exhibit 284); R45-65 (exhibit 297). As to the fifth document, counsel professed that he had "no problem" with its admission. R45-72 (exhibit 275). As to the sixth document, counsel objected, but

---

[8]Rule 803(8)(C) provides for the admissibility of "[r]ecords, reports, statements or data compilations, in any form, of public offices or agencies, setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C).

on relevancy grounds only. R45-59 thru 62 (exhibit 287). Finally, as to the seventh document, counsel again objected, but did not state any grounds for that objection.[9] R45-94 (exhibit 283). These actions were totally inadequate to preserve counsel's 803(8)(C) and 403 objections.

We note that Plaintiffs did file a motion in limine to exclude the NHTSA documents. Absent some good reason for failing to object at trial, however, such a motion does not preserve an error for appeal. *See Judd,* 105 F.3d at 1342 ("as a general proposition, an overruled motion in limine does not preserve a party's objection for purposes of appeal.... [H]owever, a motion in limine may be adequate to preserve an error ... if a good reason exists not to object at trial.") (citations omitted). Plaintiffs have not provided us with any justification for their failure to object properly at trial; we have found none on our own.

B.

Plaintiffs next challenge the district court's exclusion of the proffered testimony of Larry Bihlmeyer, an ex-Ford employee. Bihlmeyer worked as an engineer at Ford from 1972 to 1986 and would have testified that (1) a supervisor told him it was "acceptable to kill people," (2) that Ford had destroyed, altered, and withheld documents during a 1977-1982 NHTSA investigation into a wheel separation defect ("wheel separation investigation"), and (3) that he had been told not to take notes at managerial meetings concerning defects in the Bronco II.

The district court excluded item # 1 as highly prejudicial under Rule 403. That Rule permits the district court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. The district court did not err in excluding item # 1. Plaintiffs argument as to that item is without merit.

Plaintiffs contend that item # 2, which relates to the wheel separation investigation, was admissible under Rule 404(b) to establish Ford's *modus operandi.* Although it is unclear from the

---

[9]At the time of Plaintiffs' objection to the seventh document, the district court permitted Plaintiffs' counsel to voir dire the witness. Counsel's first question, however, went to the weight of the evidence rather than to its admissibility. After the district court sustained Ford's objection to that line of questioning, counsel asked no further questions of the witness and made no further objections. R45-94.

record, the court apparently excluded that item on Rule 403 grounds too. In so doing, the court cited the fact that the wheel separation investigation, according to Bihlmeyer's own testimony, had absolutely nothing to do with the Bronco II. The court further emphasized that the wheel separation investigation occurred 6 years before NHTSA's investigation into the Bronco II, and that more importantly, the Bronco II investigation did not occur until 2 years after Bihlmeyer left Ford's employment. We agree with the district court that these factors, particularly the temporal remoteness of Bihlmeyer's testimony, heavily weighed against the testimony's probative value and added to its possible prejudicial effect. We conclude (assuming the evidence was admissible under Rule 404(b)) that the court was justified in excluding it under Rule 403.

Finally, Plaintiffs maintain that the court erred in excluding item # 3. Plaintiffs proffered the following testimony for the court's consideration:

> [Plaintiffs' counsel]: [W]ere you ever assigned to a duty of taking notes or minutes at the meeting?
>
> [Bihlmeyer]: Yes.
>
> [Plaintiffs' counsel]: And ... were you ever instructed not to take notes upon a particular subject matter?
>
> [Bihlmeyer]: Yes.
>
> [Plaintiffs' counsel]: Were you ever instructed not to take notes upon the subject matter of [ ] problems that were expressed with the Bronco II?
>
> [Bihlmeyer]: Yes.
>
> [Plaintiffs' counsel]: Did they tell you why?
>
> [Bihlmeyer]: That's—that's really tough to put into words.... I was instructed not to report it, and ... there wasn't a clear explanation given, but there are other documents and other, uh, incidents that I'm aware of that made the interpretation very clear if you worked there.
>
> [Plaintiffs' counsel]: Based upon working there for years ..., what was your interpretation of the reason?
>
> [Bihlmeyer]: Well, it's—it was direct, uh, assignability to follow, not to be disputed or contradicted if you know unless you wanted to have a conflict with your management.

R37-14 thru 15.

The record is again unclear as to why the district court excluded this portion of Bihlmeyer's testimony. The court seems to have been concerned that Plaintiffs were asking the jury to engage

in pure speculation regarding the meaning of the "no note taking" directive. R37-43. The trial judge stated that despite Plaintiffs' assertions, she did not recall Bihlmeyer testifying that he was given the responsibility of taking notes to the exclusion of others in the meeting. *Id.* Finally, it appears the court felt that the time difference between Bihlmeyer's employment and NHTSA's Bronco II investigation weighed against this evidence's admissibility also. R37-48.

We have some doubt as to the correctness of the court's ruling on this issue. The fact that the meetings did not occur during the time of NHTSA's Bronco II investigation is inconsequential; the meetings occurred at a time when Ford was developing and testing Bronco II "prototypes." The first Bronco II was sold in 1983. Bihlmeyer worked at Ford until 1986. The overlap between these two periods at least made Bihlmeyer's testimony about the Bronco II's development stages relevant to the issues at trial. However, even if we assume the court erred, Plaintiffs have not demonstrated that the exclusion of this testimony had a substantial prejudicial effect on the trial proceedings.

The trial judge clearly stated that, *at the time of Plaintiffs' proffer,* she did not think the Bronco II part of Bihlmeyer's testimony was admissible. Nevertheless, the court left open the possibility that Plaintiffs could offer that same testimony on rebuttal. Plaintiffs never attempted to do so. Additionally, Plaintiffs were given the opportunity to present similar testimony through another Ford employee, Frederick Parrill, who was also present at meetings during the Bronco II's developmental stages. *See* R39-206 thru 212 (testimony of Ford employee, Frederick Parrill, agreeing that no notes were taken at engineering meetings concerning stability of Bronco II); In that sense, Bihlmeyer's testimony would have merely been cumulative. Therefore, the exclusion of this testimony could not have affected "a substantial right of the plaintiff." Fed.R.Evid. 103(a).

III.

Plaintiffs raise three separate issues concerning the district court's jury instructions. "We apply a deferential standard of review to a district court's jury instructions. So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir.1996) (quoting *United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir.1995)). Our task is to

"examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Starke,* 62 F.3d at 1380 (quoting *Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560, 1569 (11th Cir.1991)).

The district court's refusal to give requested instructions is not error if the substance of the proposed instruction was covered by another instruction, which was given. *See Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516, 1525 (11th Cir.1985). Moreover, we will not find reversible error in the refusal to give a requested instruction unless (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party. *Id.*

A.

Plaintiffs first impugn the trial court's refusal to instruct the jury on the principles of comparative negligence. There is no question that the instruction requested by Plaintiffs correctly stated the law in Florida. We thus begin with a discussion of whether the comparative negligence instruction dealt with an issue properly before the jury. The gist of Plaintiffs' argument is that when Ford withdrew its comparative negligence defense, it no longer had any right to argue that Plaintiffs' actions caused the accident. Ford's counter-argument is that its withdrawal of the comparative negligence defense did not in any way deprive it of the right to argue that Plaintiffs' actions were the "sole legal cause" of their own injuries. Florida law obligates us to agree with Ford.

In *Hoffman v. Jones,* 280 So.2d 431 (Fla.1973), the Florida Supreme Court embraced the doctrine of comparative negligence and held that contributory negligence was no longer a complete bar to recovery in the State of Florida. *Hoffman,* 280 So.2d at 438. The court noted, however, that its ruling "should not be construed so as to entitle a person to recover for damages in a case where ... the defendant's negligence was not a legal cause of the damage." *Id.* The court also affirmed that a plaintiff was still barred from recovering damages for injuries "when the plaintiff's negligence is the sole legal cause of the damage." *Id.; see also Standard Havens Products v. Benitez,* 648 So.2d 1192, 1197 (Fla.1994) (confirming that plaintiff is barred from recovery if plaintiff's own negligence was sole legal cause of injuries).

Plaintiffs do not dispute that, pursuant to *Hoffman,* they retained the burden of proving that Ford's negligence was a legal cause of their injuries. Plaintiffs also concede that Ford retained the right to defend its case by saying that its negligence "was not a legal cause of Plaintiffs injuries." However, Plaintiffs believe that by withdrawing the comparative negligence defense, Ford gave up its right to follow that statement with "what really caused this accident was either Plaintiffs' failure to hook up the trailer brakes, their failure to load the trailer properly, or Mr. Goulah's failure to properly drive the vehicle." We disagree.

As a legal matter, Florida's Third District Court of Appeal has already decided the issue presented here. *See Bryant v. Fiadini,* 405 So.2d 1341 (Fla.3d Dist.Ct.App.1981). In *Bryant,* the plaintiffs filed a negligence action against the owner of the building in which they lived after a fire killed one of their children. *Bryant,* 1342-43. The defendant's answer asserted a comparative negligence defense. The evidence at trial revealed that a portable heater in the plaintiffs' apartment caused the fire. *Id.* At the close of evidence, the defendant withdrew his comparative negligence defense and received a ruling from the trial court that no instruction on comparative negligence would be given. *Id.* at 1343. The jury returned a verdict for defendants. *Id.* The plaintiffs appealed. *Id.*

The *Bryant* court found no error in the trial court's refusal to instruct on comparative negligence and affirmed the jury verdict:

> A defendant has a right to waive any defense.... Comparative negligence only has the effect of reducing damages if liability is established.... We find no error in refusing to charge on comparative negligence, but even if it was, it was harmless error because the jury found no liability.

*Id.* (citations omitted). The court further emphasized that the judgment should not be reversed "because the rule is well settled that where evidence in a law case discloses no liability, there can be no recovery and a verdict for the defendant in such cases must stand." *Id.*

*Bryant* controls the outcome of this case. Like the jury in *Bryant,* the jury here found that Ford was not liable for any negligence.

Thus, they never had to reach the comparative negligence issue. Plaintiffs' reliance on the Florida Supreme Court's decision in *Ridley v. Safety Kleen Corp.,* 693 So.2d 934 (Fla.1996), *reh'g*

*denied,* 22 Fla. L. Weekly Supp. 167 (Fla.1997) is misplaced. The *Ridley* court held that failure to wear a seat belt should be properly raised as part of the comparative negligence defense. *Ridley,* 693 So.2d at 944. The case does not stand for the proposition, however, that "comparative negligence instructions must be given, when requested, when negligence on the part of the plaintiffs is being alleged...." Appellant's Reply Br. at 20. The defendant in *Ridley* both asserted and maintained an affirmative defense throughout the proceedings. 623 So.2d at 935. That fact alone makes *Ridley* distinguishable from our case.

In further support of our decision, we conclude that even if Ford had never raised a comparative negligence defense, the same evidence of trailer brakes, improper loading, improper driving, and seat belts would have been admissible at trial and Ford would have been able to make the same arguments it made in this case. Evidence on the issues of the trailer and driving directly refutes Plaintiffs' contention that Ford's negligence caused this accident. Ford was not limited to saying, "we didn't cause this." Ford had every right to tell the jury who or what it believed made this accident happen.

B.

Plaintiffs' second objection concerns the court's failure to instruct the jury that NHTSA's requirements were merely "minimum standards." Plaintiffs requested an instruction that "even if you find the defendant met all Government standards and Government regulations and requirements, which are minimum standards, such compliance is not a defense if a reasonable and prudent manufacturer would have taken added precautions." R50-24. The court gave the following instruction instead:

> During the course of the trial you have heard testimony that Ford complied with certain federal regulations in designing the Ford Bronco II. Federal regulations do not establish the standard to which a manufacturer is held in a negligence action. Compliance with these regulations does not exempt Ford from liability. You may, however, consider any compliance with these, along with other evidence presented in determining whether Ford used reasonable care in designing or manufacturing the product.

R51-141. Plaintiffs challenge the court's failure to use the phrase "minimum standards." Plaintiffs' objection, however, is merely a matter of semantics. The jury was instructed that compliance did not exempt Ford from liability; that instruction sufficiently covered the topic.

## C.

Finally, Plaintiffs object to (1) the court's instruction that Ford did not withhold documents from NHTSA and (2) to the court's refusal to instruct on the "bad faith" destruction of evidence. We have greatly simplified the evidence presented in this three week trial. However, we can comfortably say that most, if not all, of the "evidence" presented on the issues of Ford's misconduct with regard to the Bronco II was either stated by an attorney during questioning or was total conjecture. The district court did not err in withdrawing these issues from the jury.

## IV.

We affirm without discussion the court's denial of Plaintiffs' motion for default judgment on the grounds of bad faith destruction of evidence, the court's refusal to submit the issue of punitive damages to the jury, and the court's denial of Plaintiffs' motion for new trial based on a statement made by defense counsel in closing argument. The judgment entered in favor of Ford Motor Company is hereby AFFIRMED.