Brenda Mills WALLS, as co-personal representative for the Estate of Jason Christopher, Deceased, Plaintiff,

v.

ARMOUR PHARMACEUTICAL COMPANY, Defendant.

No. 89–1705–CIV–T–23B.

United States District Court, M.D. Florida, Tampa Division.

Sept. 1, 1993.

Jeré M. Fishback, Kleinfeld & Fishback, St. Petersburg, FL, for plaintiff.

Douglas F. Fuson, Sidley & Austin, Chicago, IL, Edward W. Gerecke, Carlton, Fields, Ward, Emmanual, Smith & Cutler, P.A., Tampa, FL, for defendant.

### *OPINION DENYING DEFENDANT'S ALTERNATIVE MOTION FOR A NEW TRIAL PURSUANT TO RULE 59(a)*

HILLMAN, Senior District Judge, Sitting by Designation.

This is a wrongful death diversity action brought by Brenda Mills Walls as co-personal representative of the Estate of Jason Christopher, deceased. Brenda Mills Walls is the natural mother of Jason Christopher ("Jason"), who died on February 2, 1992. Defendant is Armour Pharmaceutical Company ("Armour"), a Delaware corporation doing business in the State of Florida. During the years 1982–1985, among other products, Armour manufactured and sold under vari-

ous brand names a plasma product generically known as Factor VIII concentrate.

During his entire life, Jason suffered from classic hemophilia, Type A, a hereditary bleeding disorder. Treatment required transfusions of Factor VIII concentrate. It is claimed that between January 30, 1983, and May 24, 1985, Jason used and consumed Factor VIII concentrate manufactured by Armour. As a result, plaintiff claims that Jason was infected with the Human Immunodeficiency Virus (HIV), which developed into the condition known as Acquired Immune Deficiency Syndrome (AIDS). As a result of complications caused by AIDS, Jason died on February 2, 1992, at the age of eleven.

This action was originally filed on December 27, 1989, by Steven R. Christopher, Jason's father, on Jason's behalf as a personal injury action. While this action was pending, the child died. Under Florida law, Jason's personal injury claims were extinguished by his death. Fla.Stat. § 768.20. On April 29, 1992, Jason's mother, Brenda Mills Walls, on behalf of the estate, filed an amended complaint for damages and demand for jury trial. The amended complaint reflected Jason's death and asserted a wrongful death action under the Florida Wrongful Death Act, Fla. Stat. §§ 768.16–27.

Following a six-day trial, the jury awarded total damages of $2,007,256.13. In response to special interrogatories, the jury unanimously found, from the greater weight of the evidence, the following facts: 1) that Jason Christopher was infected with the AIDS virus from Factor VIII concentrate produced and sold by Armour Pharmaceutical Corporation ("Armour") (Verdict, Question # 1); 2) that Armour was negligent in failing to warn prescribing physicians in a timely or an effective manner of a potential AIDS risk associated with its Factor VIII concentrate product (Verdict, Question # 2); and 3) that Armour's negligence was a proximate cause of Jason Christopher's death (Verdict, Question # 3). The jury awarded damages of $1 million to Brenda Mills Walls, Jason's mother; $1 million to Steven R. Christopher, Jason's father; and $7,256.13 to Jason's estate for funeral expenses (Verdict, Question # 4). In addition, the jury found, from the greater weight of the evidence, that Jason's parents, Steven R. Christopher and Brenda Mills Walls, did not know or should not have known before December 27, 1985, 1) that Jason was infected with the AIDS virus (Verdict, Question # 5); or 2) that there was a potential causal connection between Jason's HIV-infection and his use of Factor VIII concentrate (Verdict, Question # 6).

On July 2, 1993, the court denied Armour's renewed Fed.R.Civ.P. 50 motion for judgment as a matter of law. *Brenda Mills Walls v. Armour Pharmaceutical Co.*, 832 F.Supp. 1467 (M.D.Fla.1993) (*"Armour"*). Presently before the court is Armour's alternative motion for a new trial pursuant to Fed.R.Civ.P. 59(a). Armour claims that the judgment entered by the Clerk on January 27, 1993, should be vacated and a new trial ordered. Armour claims that the verdict in this matter was tainted by error, including the allegedly improper admission of prejudicial damage evidence; the court's refusal to bifurcate the plaintiff's liability case from her allegedly unrelated but inflammatory proofs of damages; allegedly confusing and misleading jury instructions; allegedly improper argument by plaintiff's counsel during his opening statement and closing argument; allegedly improper and extraneous comments by one of plaintiff's witnesses; and the cumulative effect of these allegedly prejudicial errors. In addition, Armour claims that the jury's verdict was against the manifest weight of the evidence. (I assume defendant means the great weight of the evidence.) *See Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1515–16 (11th Cir.1989).

### STANDARD FOR FED.R.CIV.P. 59(a) MOTIONS

Fed.R.Civ.P. 59(a) provides the following:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

However, in considering a motion for new trial, the district judge should not substitute

his or her own "credibility choices and inferences for reasonable credibility choices and inferences made by the jury." *Redd v. City of Phenix City, Ala.,* 934 F.2d 1211, 1215 (11th Cir.1991) (citations omitted).

The general standard by which the Eleventh Circuit reviews orders for new trials is abuse of discretion. *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1498 (11th Cir.1987). This standard recognizes the deference due "the trial court's firsthand experience of the witnesses, their demeanor, and a context of the trial." *Id.* The Eleventh Circuit considers that this level of deference is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed. *Id.*

However, when the district court grants the motion for new trial, the Eleventh Circuit's review "is broader and the application of the abuse of discretion standard [is] more stringent." *Jackson v. Pleasant Grove Health Care Center,* 980 F.2d 692, 695 (11th Cir.1993) (citing *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir.1984)). In particular, the Eleventh Circuit more strictly scrutinizes orders granting new trials where the basis of the order is that the verdict is against the weight of the evidence, as opposed, for example, to situations where there is new evidence. *Rosenfield,* 827 F.2d at 1498. In such a case, the Eleventh Circuit's review "will be extremely stringent to protect a party's right to a jury trial." *Redd,* 934 F.2d at 1215. Moreover, "to assure that the judge does not simply substitute his judgment for that of the jury," the Eleventh Circuit has noted "that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great, not merely the greater, weight of the evidence." *Redd,* 934 F.2d at 1214 (citations omitted).

## I.

### ARMOUR'S CLAIM THAT ADMISSION OF VIDEOTAPED DEPOSITION, COUPLED WITH REFUSAL TO BIFURCATE TRIAL, WAS PREJUDICIAL ERROR

Armour filed a motion in limine to exclude Jason's videotaped deposition on October 14, 1992, and raised the matter during the pretrial conference on January 4, 1993. Trial began on January 11, 1993. Since at that time I had not yet ruled on Armour's motion in limine, Armour filed a motion to bifurcate the liability and damage issues of the trial. On January 11, 1993, I denied the motion to bifurcate, and on January 14, 1993, denied the motion to exclude the videotape. I moreover denied Armour's oral motion for reconsideration of the court's ruling regarding the videotape, made before the videotape was played for the jury, as well as Armour's subsequent motion for a mistrial, made after the videotape was admitted and shown to the jury.

Armour renews its claims that Jason's videotaped deposition was irrelevant, emotional, and highly prejudicial. Moreover, Armour argues that the videotape should not have been shown since, under Florida law, Jason's own pain and suffering from his AIDS infection were not at issue at trial. *See* Fla.Stat. §§ 768.16–27. Because only the mental pain and suffering of Jason's parents were compensable, Armour argues that it was error for the court to admit Jason's videotaped deposition and to refuse to bifurcate the trial as to liability and damages. For the reasons discussed below, I conclude that there is no merit to Armour's claims.

 The videotape was merely a videotaped deposition of a declarant unable to be present or to testify at trial because of his death. *See* Fed.R.Evid. 804(a)(3). Further, the videotaped testimony admitted at trial was relevant to the issues to be decided by the factfinder. *See* Fed.R.Evid. 401, 402. As stated by the Florida appellate court in a wrongful death action to recover damages for the death of a child struck and killed in an accident, "The mental pain and suffering of the parents of the child are not to be measured by how the child might appear in the eyes of the appellate judges or of counsel." *Coast Cities Coaches, Inc. v. Donat,* 106 So.2d 593, 596 (Fla. 3d DCA 1958). "It was the effect in pain and suffering on the parents, of the loss of their own child, with which the jury was concerned, and which the

jury had the opportunity and the duty under the statute to assess." *Id.*

Further, while the subject-matter of the videotape was of necessity emotional, it was not sensationalized. I note that courts have usually admitted into evidence even graphic pictures of injuries or dramatized "day-in-the-life" videotapes under the rationale that such pictures are "certainly admissible as a matter of discretion by the trial judge, if not as a matter of right." *Holmes v. Black River Electric Coop.,* 274 S.C. 252, 262 S.E.2d 875, 878 (1980). In *Holmes,* the trial court admitted pictures of plaintiff's injured and amputated arm. The appellate court found no error, rejecting defendant's claim that this was "hideous, grotesque, and grossly unfair." *Id.* The court further stated that:

> There can be no doubt but that they [the photographs] prejudiced the defendant's case in the sense that they were detrimental, but they showed a condition which [plaintiff] was entitled to either describe to the jury in words or by pictures, or a combination of the two. This demonstrative evidence aided the jury in its evaluation of the injuries and pain suffered. It cannot be said that they were introduced in evidence for the sole purpose of inflaming the minds of the jury; they served the proper purpose of bringing vividly to the jurors the details of tremendous injuries.

*Id. See also Trapp v. Cayson,* 471 So.2d 375, 381 (Miss.1985), in which the appellate court found no error in the trial court's admitting a ten-minute film that "illustrated in an informative manner the impact the injury has had on plaintiff's life": "[W]hile the scenes are undoubtedly unpleasant, so too is plaintiff's injury."

In the absence of the jury, I carefully viewed the videotape and read the accompanying transcript of Jason's testimony before making my decision. I ordered redacted those portions of the videotape that went solely to the issue of Jason's pain and suffering, not that of his parents. (Such as questions and answers dealing with the child's expectations of what he wanted to be when he grew up.) I am satisfied that the balance of the testimony which I allowed the jury to see was relevant to the issue of damages, *i.e.,* emotional pain and suffering compensable under Florida law endured by Jason's parents in caring for Jason through his physical deterioration after developing AIDS until his subsequent death. *See* Fed.R.Evid. 401, 402.

■ Further, I am satisfied that the probative value of this relevant evidence offered by plaintiff was not substantially outweighed "by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. I gave the jurors detailed limiting instructions before the videotape was shown and a recapitulation of those instructions during the final jury instructions. All of these instructions emphasized the following points, specifically to insure that no danger of unfair prejudice, confusion of the issues, or misleading the jury would arise as a result of showing the videotape:

1) that the videotape was being offered solely on the issue of damages, and was not relevant to issues of liability;

2) that the matter of damages should not affect the jury's decision on liability; and

3) that the plaintiff could not recover damages for Jason's pain and suffering, but only for the pain and suffering of Jason's parents.

(*See* Trial Transcript ("TT"), Vol. 4 at 178–82; Vol. 8 at 4, 23, 25).

Finally, prior to showing the videotape, defense counsel requested in the absence of the jury the court admonish spectators to refrain from any emotional outbursts. Having viewed the videotape myself, this seemed unnecessary and overly dramatic, but I did as requested. There were no audible sounds from the spectators during the showing. Likewise, I watched the jurors carefully as they viewed the videotape, and observed no outward emotion at all. After the jury was excused, I made a similar comment on the record. *See* TT, Vol. 4 at 184.

I am satisfied that this tape did not create any unfair prejudice. I am further satisfied that the jurors understood and heeded my limiting instructions. To have struck the

entire tape would have constituted error. I therefore conclude that it was not error to deny Armour's motion to exclude the videotape, and that it was proper to show the jury the "censored" portions of Jason's videotaped deposition.

Likewise, no sufficient reason was offered to the court to bifurcate the trial as to liability and damages. It is the norm, not the exception, in our judicial system to try the liability and the damages phases of a case together. *See* Advisory Committee Note to Fed.R.Civ.P. 42 (1966 Amendment) ("[S]eparation of issues for trial is not to be routinely ordered....."). Armour presented to the court no reason sufficient to have required bifurcation. An untimely death is always tragic. Yet our courts, state and federal, traditionally try wrongful death actions without bifurcation. I conclude that it was not error to deny Armour's motion to bifurcate the trial.

## II.

### ARMOUR'S CLAIM THAT ERRORS IN JURY CHARGE WARRANT NEW TRIAL

Armour objects to one of the specific jury instructions that the court gave and to the court's omission of other instructions that Armour had requested be given. Armour claims that, because of these alleged errors, it is entitled to a new trial.

### STANDARD

An error in the jury instructions is reversible error where the appellate court is left with "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074 (11th Cir.1987) (citing *Johnson v. Bryant*, 671 F.2d 1276, 1280 (11th Cir.1982); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir.1981); *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1525 (11th Cir.1985); *Cruthirds v. RCI, Inc.*, 624 F.2d 632, 636 (5th Cir.1980); *Somer v. Johnson*, 704 F.2d 1473, 1478 (11th Cir.1983)). The Eleventh Circuit looks to whether the trial court's charges to the jury, considered as a whole, sufficiently

instructed the jury so that the jurors understood the issues involved and were not misled. *Pate*, 819 F.2d at 1081 (citing *Pesaplastic*, 750 F.2d at 1525). Plain error necessitating a new trial occurs when instructions "mislead the jury or leave the jury to speculate as to an essential point of law." *Pate*, 819 F.2d at 1081 (quoting *Cruthirds*, 624 F.2d at 636).

### A. *Proximate Cause Instructions*

Armour claims that the court initially instructed the jury correctly on the issue of whether Jason's treating physician had independent knowledge of the AIDS risk associated with Factor VIII concentrate sufficient to break the chain of proximate causation between Armour and Jason Christopher:

> [I]f the physician had this knowledge about the possible association of AIDS that is set forth in this warning which came out [that "the possibility exists" that AIDS "may be transmitted" by blood and blood products], if the doctor knew that already, then the absence of the warning, you see, wouldn't have made any difference, whether the warning was there or whether it wasn't because ... he knew it already.

TT, Vol. 8 at 21–22. However, Armour claims that the court then erroneously gave the following charge:

> Therefore, ... your verdict would be for Armour if you find ... that Jason Christopher's hemophilia treater, that is, Dr. Barbosa, knew himself at the time in question that there was reasonable evidence of an association of a serious hazard, that is, AIDS, with Factor VIII concentrate. Because, as I've mentioned to you, if Dr. Barbosa had such knowledge, then Armour's failure to warn him would not be a proximate cause of the injury to Jason.

TT, Vol. 8 at 22.

Armour claims that this second instruction added an erroneous layer of additional proof for Armour. In other words, Armour objects to the court's instructing the jury that Armour must prove that Dr. Barbosa himself knew of "reasonable evidence of an association" of AIDS with Factor VIII concentrate, rather than merely that the "possibility ex-

ists" that AIDS "may be transmitted" by blood and blood products.

Armour is correct in stating that this second instruction added an additional layer of proof for Armour. Armour is incorrect in claiming that it was error for the court to give this instruction. I discussed the issue of Armour's obligations in this regard under binding federal law at length in my previous ruling in this matter and here incorporate that discussion at *Armour*, 832 F.Supp. at 1483–1486. I am satisfied that Armour is not entitled to avail itself of the "learned intermediary" doctrine to escape liability for an injury caused by its Factor VIII concentrate merely by establishing that the prescribing physician was aware of the information provided in its eventual warning:

> Rather, Armour would only be entitled to avail itself of the "learned intermediary" doctrine to escape such liability if it could also establish that the prescribing physician not only knew of the "possibility" of the AIDS risk set forth in the ultimate warning, but also had independent knowledge of "reasonable evidence" of an "association" of an AIDS risk with Factor VIII concentrate at the time that Armour should have issued a warning about this product, as required by federal regulations.

*Armour*, 832 F.Supp. at 1485. The instructions to which Armour objects on this issue were therefore not in error, but were an accurate statement of Armour's obligations in this regard under binding federal law.

#### B. *Omission of Requested Foreseeability Instructions*

■ First, Armour claims that it was error for the court, in defining negligence, to decline to instruct the jury that foreseeability of a likely result is required. Second, Armour further claims that it was error for the court to decline to instruct the jury that only a known or reasonably foreseeable risk triggers a manufacturer's duty to warn.

Armour cites no Florida case decided within the framework of binding federal law applicable to prescription biological products to support its claims in this regard.[1] As discussed in my previous ruling, 21 C.F.R. § 201.57(e) states the following:

> [T]he labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.

*See Armour*, 832 F.Supp. at 1483–1486. It is this binding federal regulation, not Florida common law, that controls the nature of Armour's duty to warn. To the extent that Florida common law on foreseeability is consistent with this federal regulation,[2] there

---

1. Armour cites *Crown Liquors of Broward, Inc. v. Evenrud*, 436 So.2d 927, 930 (2d DCA 1983), *review denied*, 447 So.2d 886 (Fla.1984) and *McCain v. Florida Power Corp.*, 593 So.2d 500, 503 (Fla.1992) to support its claim regarding the court's first allegedly erroneous omission concerning foreseeability. These cases are not on point. In *Crown Liquors*, plaintiff suffered a personal injury in a tavern fight. In *McCain*, plaintiff suffered a personal injury while operating electrical machinery.

 Armour cites *Tampa Drug Co. v. Wait*, 103 So.2d 603, 607 (Fla.1958) and *Lake v. Konstantinu*, 189 So.2d 171 (Fla. 2d DCA 1966) to support its claim regarding the court's second allegedly erroneous omission concerning foreseeability. In *Tampa Drug*, plaintiff's husband died as the alleged result of carbon tetrachloride poisoning after using defendant's product to clean his floors. In *Lake*, a father sought damages for the death of his daughter, who allegedly died as a result of ingesting a drug manufactured by defendant drug manufacturer.

 *Lake* at first glance appears to be on point. It is the only case Armour cites to support its allegations concerning the court's omissions of Armour's suggested foreseeability instructions that concerns a prescription drug. However, *Lake* was decided some thirteen years before the controlling law, 21 C.F.R. § 201.57(e), was adopted on June 26, 1979. *Lake* therefore provides no authority upon which I may rely in deciding this case.

2. Armour's present argument that the court's omission of its requested jury instructions on common law foreseeability was in error is at best anomalous in light of the position that Armour took on this issue in its pre-trial brief. At that time, Armour claimed that "[f]ederal regulations

was no need to give separate foreseeability instructions. To the extent that Florida common law on foreseeability might be inconsistent with Armour's duty under federal law to revise its Factor VIII labeling "as soon as there is reasonable evidence of an association of a serious hazard with a drug," it would be preempted, and there would be no need to give separate foreseeability instructions.

In either case, the omission of the instructions to which Armour objects was not error. The requested instructions were unnecessary under the comprehensive framework of binding federal law that is controlling in this case. I am satisfied that I properly instructed the jury in detail concerning Armour's duty to warn under applicable federal law. *See* TT, Vol. 8 at 18–20.

C. *Omission of Requested Instructions Re Compliance With Industry Practice and Federal Regulations*

Armour claims it was error for the court to decline to instruct the jury (1) that the approval of its package labeling by the Food and Drug Administration ("FDA"), and (2) that Armour's compliance with standard industry practice, are evidence that Armour acted with reasonable care. Armour further objects to this omission since I instructed the jury that violation of federal regulations was evidence of negligence.[3]

However, as the plain language of C.F.R. § 201.57(e) makes explicit and as I discussed at length in my previous ruling,

Armour's claim in this regard misconceives the nature of the duty placed upon it by the comprehensive framework of federal law referenced above. *See Armour*, 832 F.Supp. at 1481–1482, 1483–1484. The plain language of C.F.R. § 201.57(e) is not discretionary. It requires that pharmaceutical companies "shall" revise labeling "as soon as" there is "reasonable evidence" of an "association" of "serious adverse reactions and potential safety hazards" with a drug. It is explicit that "a causal relationship need not have been proved." *Id.* As I concluded in *Armour*, the fundamental issue to be resolved in this case was whether Armour in fact had such "reasonable evidence" about its Factor VIII product before it applied for permission from the FDA to warn of an AIDS risk. This is precisely the issue that was submitted to the jury and on which the jury's verdict was adverse to Armour.

It would have been an incorrect statement of federal law for the court to have instructed the jury, as Armour requested, that the FDA's approval of Armour's eventual package labeling for its Factor VIII concentrate was "evidence" that Armour acted with "reasonable care." This is a failure-to-warn case in which plaintiff's major thrust was that Armour in fact had "reasonable evidence" of an association of an AIDS risk with its Factor VIII concentrate and did not in fact apply to the FDA to issue a warning about its product as soon as it was bound to do so. That the FDA approved Armour's eventual

regarding drug labeling accord with the Florida common law requirement that a drug manufacturer must provide warnings regarding reasonably foreseeable risks" (citing 21 C.F.R. § 201.-57(e)). Brief at 10 (consistent Florida case law cited in Brief at 9).

3. Armour again cites no Florida case decided within the framework of binding federal law applicable to prescription biological products to support its claims in this case. Armour instead cites the following irrelevant cases:

*Nicosia v. Otis Elevator Co.*, 548 So.2d 854, 856 (Fla. 3d DCA 1989), in which plaintiff was injured in escaping from a stalled elevator;

*Tampa Drug Co. v. Wait*, 103 So.2d 603, 610 (Fla.1958), in which plaintiff's husband died as the alleged result of carbon tetrachloride poisoning after using defendant's product to clean his floors;

*St. Louis–San Francisco Ry. Co. v. White*, 369 So.2d 1007, 1011 (Fla. 1st DCA 1979), *cert. denied*, 378 So.2d 349 (Fla.1979), in which plaintiffs' decedent was killed in a grade crossing accident with one of the railroad's trains;

*Alderman v. Wysong & Miles Co.*, 486 So.2d 673, 679 (Fla. 1st DCA 1986), in which appellant's decedent sustained fatal injuries as a result of being crushed underneath a machine press brake;

*Jiminez v. Gulf & Western Mfg. Co.*, 458 So.2d 58, 59 (Fla. 3d DCA 1984), in which appellant's hand was crushed in an unguarded area of a punch press; and

*Lollie v. General Motors Corp.*, 407 So.2d 613, 617 (Fla. 1st DCA 1981), *review denied*, 413 So.2d 876 (Fla.1982), in which appellants or their decedents were injured or killed in a fire resulting from rupture of a fuel tank following an automobile collision.

warning is irrelevant to a determination of whether Armour in fact applied to the FDA as soon as federal law required it to do so.

With respect to the issue of standard industry practice, presumably knowing whether it was the contemporaneous industry practice to warn of AIDS risks on labeling of Factor VIII products would provide some evidence of whether there in fact existed "reasonable evidence" of an association of an AIDS risk with these products at the time in question. However, knowing this fact alone, even if Armour's practice was consistent with that of the entire pharmaceutical industry in this regard, would not provide "evidence" that Armour itself acted with "reasonable care." Plaintiff introduced numerous documents, including many of Armour's own internal memos, to prove that Armour in fact had "reasonable evidence" of an AIDS risk long before it applied to the FDA for permission to issue a warning with its Factor VIII product. If Armour violated federal law, then it could not be said that Armour acted with "reasonable care," whether or not in doing so Armour acted in compliance with contemporaneous industry practice.

For example, assuming that no pharmaceutical companies at that time provided AIDS warnings with their blood products, in at least two situations it would be an incorrect statement of federal law to say that Armour's compliance with industry practice was "evidence" of "reasonable care." The first situation would be if the entire industry had "reasonable evidence" of an AIDS risk, yet no company issued any AIDS warnings. In this situation, the entire industry, including Armour, would have been negligent. The second situation would be if Armour, a lead-ing pharmaceutical company, had a greater amount of "reasonable evidence" of an AIDS risk than did the rest of the industry, yet no company issued any AIDS warnings. In this latter situation, Armour, and perhaps Armour alone, could have been negligent. In both of these situations, Armour could have complied with industry practice, yet its compliance could in no way be relevant to the issue of whether Armour had reasonable evidence of an AIDS risk before it applied to the FDA for permission to issue an adequate warning.

To decide this case, the jurors had to determine when Armour itself had "reasonable evidence" of an association of an AIDS risk with its Factor VIII concentrate product. I am satisfied that I properly instructed the jury concerning Armour's duty to warn under applicable federal law. See TT, Vol. 8 at 18–20. Moreover, within the framework of comprehensive federal law applicable to this case, violation of federal law is always evidence of negligence. It was therefore not error to omit Armour's requested instructions relating to compliance with federal regulations and industry practice as "evidence" of "reasonable care." As discussed above, it could have been error to include them.

D. *Omission of Instruction Re Reasonable Medical Probability*

■ Armour claims that it was error for the court to decline to instruct the jury that plaintiff had the burden of demonstrating causation as a matter of reasonable medical probability.

However, Armour cites no Florida case that supports its claims in this regard.[4] The cases that Armour cites merely establish that "In negligence actions Florida courts follow

4. Armour cites *Gooding v. University Hosp. Bldg., Inc.,* 445 So.2d 1015 (Fla.1984); *Greene v. Flewelling,* 366 So.2d 777 (2d DCA 1978), *cert. denied,* 374 So.2d 99 (Fla.1979); *Heyman v. United States,* 506 F.Supp. 1145, 1150 (S.D.Fla.1981); *Cassel v. Price,* 396 So.2d 258, 266 (1st DCA 1981), *petition denied,* 407 So.2d 1102 (Fla. 1981).

In *Gooding,* the Supreme Court of Florida answered certified questions to approve the appellate court's decision in a case in which the personal representative of the deceased brought a wrongful death action against the hospital alleging that medical malpractice caused the death of her decedent. The Supreme Court of Florida

held that a jury could not reasonably find that but for the negligent failure to properly diagnose and treat the decedent he would not have died. The testimony established "a no better than even chance" for the decedent to survive. *Gooding,* 445 So.2d at 1018.

In *Greene,* the appellate court affirmed the trial court's setting aside the jury verdict in favor of plaintiff on the grounds that it was not supported by competent, substantial evidence. The court noted that the physician's testimony militated against the conclusion that plaintiff lost his ability to smell and taste as a result of the accident. The evidence therefore raised at best a mere

the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding v. University Hosp. Bldg., Inc.,* 445 So.2d 1015, 1018 (Fla.1984) (citations omitted). *See also Greene,* 366 So.2d at 781; *Heyman,* 506 F.Supp. at 1150; *Cassel,* 396 So.2d at 266. In *Greene,* the court further stated that "[t]he general rule seems to be that it is necessary to demonstrate legal causation by expert testimony where this knowledge is beyond the common knowledge of laymen." *Greene* at 780 (citing W. Prosser, *The Law of Torts* 241 (4th ed. 1971); other citations omitted).

None of these cases stand for the proposition that it is error warranting a new trial for a court to decline to instruct the jury that plaintiff had the burden of demonstrating causation as a matter of reasonable medical probability. *Greene* is the only one of these cases that even mentions jury instructions. Yet, in *Greene,* the trial court gave no instruction such as that requested by Armour here, but instead gave the pattern Florida negligence instruction on "but for" causation. *Id.*

I am satisfied that I instructed the jury properly on Florida negligence law:

> Now, in order to prove the essential elements of her negligence claim, the burden is on the plaintiff to establish by the greater weight of the evidence the following: First—and I think these will seem natural to you—that Jason Christopher was infected with HIV from using Armour's factor VIII concentrate. That's the first question the jury is going to be asked to decide.
>
> Second, that before the time Jason Christopher was infected with HIV, plaintiff must prove that Armour negligently

failed to warn the patient's prescribing physicians of a possibility of AIDS when it knew or should have known that reasonable evidence existed of an association of a serious hazard, that is, AIDS, with its factor VIII concentrate.

> Thirdly, that such negligence was a proximate cause of plaintiff's injuries; that is, had Armour provided such a warning, Jason Christopher would not have been infected with HIV. And then, fourth, of course, the plaintiff has suffered damages as a result of such negligent failure to warn.
>
> So, those are basically the elements that the burden is on the plaintiff to prove. And if you find that plaintiff has proved all of the foregoing essential elements of her claim by the greater weight of the evidence, then your verdict should be for plaintiff. But if you find that plaintiff has failed to prove any one or more of these essential elements, then, of course, your verdict should be for Armour.

TT, Vol. 8 at 17–18.

This was a correct statement of Florida law. *Gooding,* 445 So.2d 1015 (Fla.1984). It was therefore not error nor required to give Armour's requested instruction that plaintiff had the burden of demonstrating causation as a matter of reasonable medical probability.

## III.

### *ARMOUR'S CLAIM THAT IMPROPER ARGUMENT BY PLAINTIFF'S COUNSEL WAS PREJUDICIAL*

#### *STANDARD*

The standard for determining whether a jury verdict should be set aside because of

---

possibility of legal causation. *Greene,* 366 So.2d at 781.

In *Heyman,* the district court dismissed plaintiff's action because plaintiff failed to show that there was any likelihood that her Guillian–Barre Syndrome had been caused by a swine flu inoculation. Plaintiff's own expert, a physician, testified that it was merely "conceivable" that the shot had caused plaintiff's condition. Another physician suggested a theory of causation that plaintiff did not argue, stating that it was "possible" that the shot acted as a sensitizing agent. *Heyman,* 506 F.Supp. at 1150.

*Cassel* does not even involve medical issues. In *Cassel,* the appellate court affirmed the circuit court's summary judgment for the landowner in a case in which parents had sued the landowner seeking damages for the death of their 11–year-old son. The child had died as the result of a fall from a mulberry tree on the landowner's property. The court found plaintiffs' theories of negligence or attractive nuisance merely speculative and insufficient as a matter of law to meet Florida's "more likely than not" standard in negligence cases. *Cassel,* 396 So.2d at 266 (citing *Greene,* 366 So.2d 777, and Prosser, *The Law of Torts,* 241 (4th Ed.1971)).

counsel's misconduct is whether the conduct was "'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *Bankatlantic v. Blythe Eastman Paine Webber, Inc.,* 955 F.2d 1467, 1474 (11th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 966, 122 L.Ed.2d 122 (1993) (quoting *Allstate Insurance Co. v. James,* 845 F.2d 315, 318 (11th Cir.1988)). Moreover, the trial judge is given "broad discretion" in controlling counsel's arguments. *Bankatlantic,* 955 F.2d at 1474. "Absent an abuse of discretion," the decision of the trial court, "'which has had the opportunity to hear the offensive remarks within the context of the argument and to view their effect on the jury, should not be disturbed.'" *Bankatlantic,* 955 F.2d at 1474 (quoting *Allstate,* 845 F.2d at 318).

## A. *The "Missing Witness" Claim*

■ Armour objected at trial to the following comments that plaintiff's counsel made during his closing argument:

> Also ask yourselves why didn't you hear from any other hemophilia treaters on Armour's side of this case other than Dr. Levine? He was the only one who testified for them who was a hemophilia treater. Why didn't we hear from some of these other people with [National Hemophilia Foundation's] medical and scientific committee?

TT, Vol. 7 at 34. Armour here renews its objection to this argument and further objects to the following response of the court, given at trial after Armour's objection to the above argument of plaintiff's counsel:

> I think that that's a matter of argument. I think that—I'm going to be instructing the jury that they must decide this case on the evidence and inferences that can be drawn from the evidence, and I think that who

testified or who didn't or who might have been called, I think that's a fair, legitimate argument. I'll overrule that objection.

*Id.* Armour claims that, because the argument of plaintiff's counsel violated the "missing witness" rule, the court erroneously overruled its objection and compounded the error by its subsequent remarks.

The "definitive statement" of the missing witness rule was issued by the United States Supreme Court a century ago: "'The rule ... is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.'" *Herbert v. Wal-Mart Stores, Inc.,* 911 F.2d 1044 (5th Cir. 1990) (quoting *United States v. Graves,* 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893).[5] However, as the Eleventh Circuit has recently noted, the Supreme Court "embraced" this rule "long ago when the Federal Rules of Evidence were very different." *Jones v. Otis Elevator Co.,* 861 F.2d 655, 659 n. 4 (11th Cir.1988).

In *United States v. Hendrieth,* 922 F.2d 748, 751 (11th Cir.1991), the defendant challenged the prosecutor's reference in closing argument to defendant's failure to call certain witnesses or to present evidence that he was not guilty. During closing argument, the prosecutor in *Hendrieth* stated that "'the only witness the defense called was a police officer,'" and pointed to defendant's failure to call additional witnesses. *Hendrieth,* 922 F.2d at 751. The prosecutor further commented that there was no evidence presented to indicate that defendant was not guilty and made other such statements regarding the lack of exculpatory evidence. *Id.*

See also *Herbert,* 911 F.2d at 1046–49, for the Fifth Circuit's scholarly discussion of the original reasons for the missing witness rule, the implications of considering the rule in conjunction with the *Erie* doctrine, and the "enormous changes" wrought in federal practice since the Supreme Court formulated the rule by the adoption of the Federal Rules of Evidence and the Federal Rules of Civil Procedure.

---

5. In *Herbert,* the Fifth Circuit ultimately applied the missing witness rule to conclude that the potential witness's testimony would not have been adverse to the party who did not call him. *Herbert,* 911 F.2d at 1049.

 However, "after giving the issue due consideration," the Fifth Circuit also concluded in *Herbert* that the missing witness rule "has no place in federal trials conducted under the Federal Rules of Evidence and the Federal Rules of Civil Procedure." *Herbert,* 911 F.2d at 1047.

In determining whether these remarks of the prosecutor met the test warranting the granting of a new trial, the Eleventh Circuit stated that the prosecutor made no comment on defendant's own failure to testify. Rather, "[h]is remarks were directed to the failure of the defense to counter or explain the evidence." *Id.* (Citations omitted). Without even mentioning the missing witness rule,[6] much less that it had been violated by the prosecutor's remarks, the Eleventh Circuit stated "that it found no error in the failure of the district court to declare a mistrial based upon the prosecutor's remarks to the jury." *Id.*

After carefully considering the above case law, I conclude that the missing witness rule does not apply in this situation. However, even if the rule should apply, it was not violated. A review of the arguments of plaintiff's counsel immediately preceding those to which Armour objects makes clear that those remarks, like those of the prosecutor in *Hendrieth,* were merely "directed to the failure of the defense to counter or explain the evidence," *Id.:*

> But in this case we're only obligated to convince you of our position on these issues by a greater weight of the evidence. Look at our evidence; look at their evidence, and determine whose has the greater weight. Now, this is not just a question of who brought in the most doctors or the most witnesses to testify here. And don't misunderstand me, we're not trying to weigh evidence by the pound here. We're talking about quality of evidence.
>
> The Judge is also going to talk to you about what sort of factors you ought to consider in deciding which one of these witness's opinions you might choose to believe, be it a doctor or any other witness in this case. And one of the factors he's going to tell you to look at is to look at the witness's interest in the outcome of the case and what the outcome of the case might mean to him.
>
> And I bring that up at this point because particularly with regard to Dr. Levine,

who was the defendant's principal medical witness in this case, it seems clear that Dr. Levine does have an interest in the outcome in this case. Number one, because he was the medical director of the National Hemophilia Foundation at the time we contend Jason was infected. He was sending out bulletins to people all over the country with hemophilia telling them don't abandon your use of concentrate, and I'm sure that has to affect Dr. Levine's outlook.

> It's our contention that Dr. Levine feels that he has an obligation to come in here and defend his actions back in 1983, and I'd like you to think about that. More importantly, I'd like you to think about the fact that Dr. Levine in case after case after case, not only for Armour but other pharmaceutical manufacturers, has been the physician they have repeatedly brought into court to testify as their primary physician and tell you the things they want you to hear, and he's earned an awful lot of money doing that.
>
> And I think that's something else you need to take into very serious consideration in weighing the believability of his opinion testimony in this case. Because Judge Hillman will tell you that just because he allowed somebody to testify as an expert here, doesn't mean you have to believe their testimony or buy their opinions.
>
> You look at what interests they have in the outcome of the case; what's motivating them; what biases they may have; and take that into consideration when you're thinking about whose opinion you trust the most in this litigation.

TT, Vol. 7 at 32–33.

It was at this point in his argument that plaintiff's counsel made the remarks to which Armour objects:

> Also ask yourselves why didn't you hear from any other hemophilia treaters on Armour's side of this case other than Dr. Levine? He was the only one who testified for them who was a hemophilia treat-

---

**6.** As the Fifth Circuit noted, the rule has been "commonly invoked in both criminal and civil

cases." *Herbert,* 911 F.2d 1044 (5th Cir.1990).

er. Why didn't we hear from some of these other people with [National Hemophilia Foundation's] medical and scientific committee?

TT, Vol. 7 at 34.

It was perfectly proper for plaintiff's counsel to argue that defendant's principal medical witness was incorrect and biased and to emphasize the point by pointing out that defendant called no one else to corroborate that witness. I find nothing improper in these remarks of plaintiff's counsel or in my comments following Armour's objections to them at trial. *See Hendrieth*, 922 F.2d at 751.

■ In any event, even if the argument of plaintiff's counsel was improper, I am satisfied that it was at most harmless error. These were a few remarks made during a lengthy closing in a medically-complicated, week-long trial. As the court emphasized, it was the jury's responsibility to "decide this case on the evidence and inferences that can be drawn from that evidence." TT, Vol. 7 at 34. The outcome of the trial in no way turned on any possible misapprehension that the jury could have gleaned from my remarks about what was and was not to be considered proper evidence. Moreover, even the slightest misapprehension that the jury might have had in this regard would have been cured by my specific and explicit final jury instructions on that subject:

> Also remember that anything that the lawyers say is not evidence in the case.... [I]n this case there's no question we've got fine lawyers. And their arguments and their references to the law have been very helpful, but, nevertheless, you must remember that they are not witnesses, and it's your own recollection and interpretation of the evidence that controls.
>
> ... So the evidence in this case consists of the sworn testimony of the witnesses, re-

gardless of who may have produced those witnesses; all exhibits received in evidence, regardless of who may have produced them; and all facts which have been admitted or stipulated.

TT, Vol. 8 at 5–6.

In a footnote, Brief at 14 n. 25, Armour now complains that a remark of plaintiff's counsel about Dr. Mary Andriola, also made during his closing argument, similarly violated the missing witness rule. However, since Armour chose not to object to this remark at trial, it has waived any objection it might have, although for reasons stated above, there was likewise no error in plaintiff's counsel's comments about Dr. Andriola.

I therefore conclude that the remarks of plaintiff's counsel during closing argument that Armour alleges violated the missing witness rule provide no basis upon which to grant Armour a new trial. *See Hendrieth*, 922 F.2d at 751.

### B. *Other Allegedly Improper Arguments*

■ Armour claims that it was prejudiced by allegedly inappropriate remarks plaintiff's counsel made in his opening statement to the jury, which the court did not correct. Armour argues that these remarks impaired the jury's objective consideration of liability issues. Armour claims that it was "particularly egregious" for plaintiff's counsel to argue that Armour's documents would show that Armour knew "in mid to late 1982, that their concentrate product was transmitting AIDS to people who were using it." *See* TT, Plaintiff's Opening Statement at 14,[7] 15–17 (Armour's Reference: Opening at 26, 27–28).

In a footnote,[8] Armour further claims that plaintiff's counsel made allegedly inappropriate statements misrepresenting the facts of the case (citing *see, e.g.,* Opening at 26 [TT, Plaintiff's Opening at 14] )[9]; the testimony of various witnesses (citing *see, e.g.,* Closing at

---

7. At page 15 of its Alternative Motion for a New Trial Pursuant to Rule 59(a), Armour attributes this quotation to page 26 of plaintiff's opening statement. This is a page reference to an excerpt of plaintiff's opening statement which was attached to Armour's motion. For purposes of clarity, I will cite the reference used by Armour as well as the official trial transcript reference whenever these discrepancies appear.

8. Armour's Rule 59(a) Motion at 15 n. 27.

9. This is essentially the same claim as the one referenced in the immediately preceding sentence. ·

28–29 [TT, Plaintiff's Closing at 55–56]; and the contents of certain exhibits (citing *see, e.g.,* Closing at 45–46 [TT, Plaintiff's Closing at 109–110]). Armour notes that its objections to allegedly improper statements of plaintiff's counsel were overruled by the court (citing *see, e.g.,* Opening at 26 [TT, Plaintiff's Opening at 14]; Closing at 26 [TT, Plaintiff's Closing at 54]).

Having had "the opportunity to hear the (alleged) offensive remarks within the context of the argument and to view their effect on the jury," *Bankatlantic,* 955 F.2d at 1474, I deem that plaintiff's counsel made no improper argument on any of the specific occasions objected to by Armour. I have carefully reviewed the Fifth and Eleventh Circuit

cases cited by Armour in support of its claims.[10] I conclude that here there was no misconduct of plaintiff's counsel " 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.' " *Bankatlantic,* 955 F.2d at 1474 (quoting *Allstate,* 845 F.2d at 315).

As discussed in my previous ruling, plaintiff presented considerable testimony in support of her claim that Armour's duty to warn of the AIDS risk associated with Factor VIII concentrate arose at an earlier time than Armour acted. This evidence took the form of oral testimony and of exhibits including Armour's own internal documents, technical articles published in medical journals, and updates in association newsletters. *Armour,*

**10.** Armour cited the following cases to support its claims in this regard: *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 284–85 (5th Cir.1975); *Roy v. Employer's Mutual Casualty Co.,* 368 F.2d 902 (5th Cir.1966); *Bankatlantic,* 955 F.2d at 1473–74; *Newman v. A.E. Staley Mfg. Co.,* 648 F.2d 330, 334 (5th Cir. Unit B 1981).

In *Edwards,* the Fifth Circuit reversed the trial court's denial of defendant's motion for new trial and remanded the case for a new trial because counsel's argument so far exceeded proper bounds that it substantially affected the total fairness of the trial: "A particularly indefensible tactic was the use of the closing arguments to bring before the jury damaging facts not in evidence and never established." *Edwards,* 512 F.2d at 283–84. In *Edwards,* plaintiff's counsel had argued that a company representative stated that the claims and recommendations about a product made in the company's manual had been recognized by the company to be false and that the company had taken them off the market after decedent's death. However, the court's review of the employee's testimony substantiated the company's vigorous denial that its employee had ever made such a statement. *Id.*

In *Roy,* the Fifth Circuit affirmed the trial court's denial of plaintiff's motion for new trial because the trial court had properly and immediately admonished the jury after counsel's improper argument, which had been calculated to appeal to the jurors' personal interest in not increasing their own insurance expenses. *Roy,* 368 F.2d at 904–05.

In *Newman,* the Fifth Circuit reversed the trial court's entry of judgment on jury verdicts and remanded for new trial where the trial judge made remarks from the bench during trial from which the jury could have concluded that the judge himself favored plaintiff's position. For instance, in a case in which plaintiff alleged that defendant had produced and sold cattle feed that caused the death of many of his cattle, the trial judge at one point asked counsel, "Now, are you

asking about all of them or the ones he had in the feedlot at the time they were poisoned?" *Newman,* 648 F.2d at 336.

In *Bankatlantic,* plaintiff argued that defense counsel had improperly accused Bankatlantic's chairman Levan of not coming to the stand during Bankatlantic's case, of personally owning Bankatlantic, and of being a corporate raider. The Eleventh Circuit nonetheless affirmed the trial court's denial of Bankatlantic's motion for new trial: "[W]e cannot say that [the] references to Mr. Levan were either 'wholly unjustified by anything in the record' or irrelevant.... While some of the arguments could be viewed as improper, they did not appear to be references to matters outside the record." *Bankatlantic,* 955 F.2d at 1474.

In concluding that the district court did not abuse its discretion in "allowing [defense] counsel to make the references to Mr. Levan during closing argument," the Eleventh Circuit distinguished its earlier *McWhorter v. City of Birmingham,* 906 F.2d 674, 676–77 (1990), a case in which it had affirmed the district court's decision to grant a new trial. In *McWhorter,* counsel's closing argument had focused on a theory eliminated during the pretrial conference and on evidence expressly excluded by the trial judge.

Two other cases that the Eleventh Circuit cited in *Bankatlantic* as instances in which a court properly granted a new trial are *Koufakis v. Carvel,* 425 F.2d 892, 901 (2d Cir.1970) and *Gonzalez v. Volvo of America Corp.,* 734 F.2d 1221, 1225–26 (7th Cir.1984). In *Carvel,* trial counsel repeatedly likened defendant to a Mafia don, commented that he had failed to testify, and referred to irrelevant matters that were not in the record. In *Gonzalez,* counsel repeatedly referred, solely to arouse jurors' sympathy, both to defendant's corporate size (portraying it as preying on innocent consumers) and to matters outside of the record. *Bankatlantic,* 955 F.2d at 1474.

832 F.Supp. at 1481. Specifically, plaintiff presented the jury with numerous documents generated between July 1982 and July 1983 reflecting Armour's growing knowledge that hemophiliacs using concentrate were being diagnosed with AIDS and that a blood-borne, transmissible agent was spreading the disease via concentrate product produced from pools of plasma drawn from thousands of unscreened donors.

■ Plaintiff's statements on this issue were supported by competent evidence, as it was also on the other occasions to which Armour objects. Further, in response to Armour's objection at TT, Plaintiff's Closing at 54, I immediately instructed the jurors that "they should decide this case on the evidence which has been produced and reasonable inferences that may be drawn from that evidence." *Id.* Moreover, in response to Armour's objection during closing as to the above-referenced remarks of plaintiff's counsel about the contents of certain exhibits, I immediately instructed the jury, correctly but perhaps inarticulately, as follows:

> Members of the jury, if I can see over that chart, let me just tell you that in a case such as this, there are always going to be disputes as to what some particular witness said or what an article may say. And if they would be—they're exhibits, you have a chance to look at them, and you'll be the ultimate decider of where the truth lies with respect to either the testimony or to the articles that may be in dispute between the lawyers.

TT, Plaintiff's Closing at 110. Furthermore, I repeated these instructions when giving the final jury instructions. In addition, of course, the jury was instructed that the lawyers were not witnesses and what they said in their arguments was not evidence.

I remain satisfied that the jurors followed these instructions and decided the case only upon properly received evidence. I reiterate that there was nothing in the argument of plaintiff's counsel " 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.' " *Bankatlantic*, 955 F.2d at 1474 (quoting *Allstate*, 845 F.2d at 318). There is therefore no merit to Armour's claim that it was prejudiced by improper argument by plaintiff's counsel.

## IV.

### ARMOUR'S CLAIM THAT ALLEGEDLY IMPROPER AND EXTRANEOUS COMMENTS BY A WITNESS WERE PREJUDICIAL

Armour claims that improper and extraneous comments by plaintiff's witness Dr. Barbosa were not adequately cured by the court's instructions to the jury and contribute to the elements of prejudice warranting a new trial. Armour particularly objects to Dr. Barbosa's analogy of the physical condition of hemophiliacs suffering from AIDS to that of victims of starvation in Somalia. Armour further objects that, in response to questions put on cross-examination, Dr. Barbosa repeatedly displayed hostility to Armour's counsel and "launched" into nonresponsive tirades regarding purported secrecy by blood processors. After I denied Armour's motion for a mistrial because of Dr. Barbosa's "prejudicial outbursts," I instructed the jury not to consider statements that were not responsive. TT, Vol. 4 at 14–15. However, Armour claims that these instructions were inadequate to insure a fair and impartial trial.

■ Armour cites no binding authority in support of its claim that it merits a new trial because a witness during cross-examination made the sort of statements given above.[11] I

---

**11.** Armour cites the following Eleventh or Fifth Circuit cases in support of its claim: *Crown Colony Distributors, Inc., v. United States F. Ins. Co.*, 510 F.2d 544 (1975); *McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir.1990); *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir.1977). These cases are not on point. They all concern improper argument by counsel, a very different source of possible prejudice than

the allegedly improper responses of a witness during cross-examination.

*Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir.1978), also cited by Armour in support of its claim, likewise concerns improper argument by counsel.

Armour cites only two cases that concern remarks by a witness: *Beck v. Wings Field, Inc.*, 122 F.2d 114 (3d Cir.1941), and *Cecil Corley Motor Co., Inc. v. General Motors Corp.* 380

conclude that there is no merit to Armour's claim. The responses to which Armour objects were mostly parts of spirited exchanges during proper cross-examination. The reference to the appearance of children in Somalia was not brought up by the witness "to inject prejudicial and inflammatory comments so as to curry the passion and sympathy of the jury." *Corley*, 380 F.Supp. at 861. Rather, it was used by Jason's treating physician to describe the "wasting syndrome" caused in AIDS patients by persistent diarrhea, "one of the most difficult problems to deal with in taking care of Jason." TT, Vol. 3 at 103–04. Clearly this was not prejudicial error.

■ Moreover, with regard to the witness's unresponsive comments, immediately after an objection to such comments by defense counsel, the jury heard the court admonish the witness in the following manner: "I know it's very tempting to want to explain and I'm appreciative of that but, nevertheless, the way the Court works, the witness should listen carefully to the question and answer just the question put to you, if you can do that, please." TT, Vol. 3 at 127. Further, immediately after the witness's testimony was concluded, I instructed the jury in some detail that "if there was testimony that came in in which the doctor was attempting to try to lecture the jury on some-

thing that was not relevant to the answer to the question that was asked, then you should disregard that part of the answer." TT, Vol. 4 at 14–15. I have carefully considered Armour's claims of prejudice in the overall context of the trial, especially in light of my own close observations of Dr. Barbosa's demeanor on the stand.[12] I conclude that any prejudice caused by this witness's unresponsive comments to Armour's counsel during cross-examination was cured by my subsequent instructions to the jury and is no basis upon which to grant Armour a new trial.

## V.

### ARMOUR'S CLAIM THAT CUMULATIVE EFFECT OF PREJUDICIAL ERRORS IS SUFFICIENT TO WARRANT A NEW TRIAL

■ Armour claims that the cumulative effect of the prejudicial errors in the trial is sufficient to warrant a new trial. In a footnote, Armour cites "the sizeable verdict in this case" as the primary reason that "make[s] it impossible to conclude that the jury's verdict was not excessive." Brief at 18 n. 36.

However, I recall, that plaintiff's counsel argued strenuously during closing argument

---

F.Supp. 819, 860–61 (M.D.Tenn.1974). These cases are not on point.

In *Beck*, the prejudicial response of the aviator/witness was to answer the question, "Are you familiar with the scene of [the] accident?" with the statement, "Yes, sir, I cracked up in the same ditch." *Beck*, 122 F.2d at 115.

In *Corley*, the witness was the operator of the plaintiff company. Not only was the witness's conduct considerably more egregious than that alleged in this case, but the court itself also stated it was "incense[d]" over the witness's "deliberate abuse of the Court's patience": "And yet in spite of the Court's repeated admonishments [footnote number omitted], this Court believes that Mr. Corley intentionally disregarded its directions and continued to inject prejudicial and inflammatory comments so as to curry the passion and sympathy of the jury." *Corley*, 380 F.Supp. at 860–61.

12. For the record, I note that Dr. Barbosa, a naturalized citizen of the United States, was originally from Bolivia and earned his medical degree in Spain. Some of the friction that seemed to exist at certain points during Dr. Barbosa's cross-examination between the witness and Arm-

our's counsel may have stemmed as much from cultural differences in expectations about the process of cross-examination as it did from the nature of the process itself.

Moreover, I note that Dr. Barbosa was at all times an expressive and animated witness. Although Armour's counsel complains of the "hostility" with which the witness sometimes responded to Armour's counsel, I note that there were other times when the witness responded to Armour's counsel with appreciation:

Q. And discussing his ever present cervical lymphadenopathy and observing, did you not, quote, "His T cell subset analysis shows elevated T suppressor cell number. This rules out the possibility of AIDS. He's to be retested again in three months, period," close quote. Is that not correct?

A. Well, I'm glad that you brought up the subject. That gives you an idea of the confusion at *that time of the entire picture of AIDS* in interpreting this test. Right now we know that the opposite is right. Thank you, sir, for bringing up this.

Q. Certainly....

TT, Vol. 3 at 126.

for a total of $3.2 million. Plaintiff's counsel specifically asked the jury to award "one million dollars to Steven Christopher and one million dollars to Brenda Walls to compensate them for watching their son deteriorate, for seeing him die." TT, Plaintiff's Closing at 64. Plaintiff's counsel sought an additional $1.2 million for a 35–year period (Jason's remaining life expectancy) for Brenda Walls and Steven Christopher. "If you separate that out by year, that's about $36,500 a year to compensate these people for no longer having their son in the future and the way that they will feel for that 35 years." *Id.*

Despite having heard plaintiff's counsel ask for a total award of $3.2 million, Armour's counsel, for reasons best known to itself, never argued damages, but simply argued that Armour should not be found liable. Having chosen to ignore the subject of damages, Armour is in a poor position now to complain that a $2 million verdict (rather than the $3.2 million argued for by plaintiff) was excessive. As a matter of fact, under all the circumstances of this case, the verdict was not excessive.

Having carefully considered all of Armour's allegations of error, I find none. There is therefore no merit to Armour's claim that the cumulative effect of the prejudicial errors in this case is sufficient to warrant a new trial.

## VI.

### ARMOUR'S CLAIM THAT THE JURY'S VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE

Finally, Armour claims that the jury's verdict in this case was against the "manifest" (great) weight of the evidence. I carefully considered all of Armour's claims in this regard in my previous ruling before denying Armour's motion for judgment as a matter of law. I incorporate that discussion here. *Armour,* 832 F.Supp. at 1469–1504. There is no merit to Armour's claim in this regard.

### CONCLUSION

The parties were represented by very able, experienced counsel. Exceptionally well-

qualified experts from across the country testified on both sides. The jury listened attentively, unemotionally and with apparent great interest. In hindsight one can always find matters which upon second thought might have been improved. Having said that, I am satisfied that the parties, with equally-competent counsel, had a fair trial; that the jury was properly instructed; and that the verdict was supported by the evidence. And, finally, I am satisfied that neither alone nor cumulatively do Armour's claims of "prejudicial errors" rise to the level which would warrant a new trial. Defendant's Alternative Motion for a New Trial Pursuant to Rule 59(a) is denied.